**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellant,*

v.

JOSE LUIS ORTIZ-HERNANDEZ,
              *Defendant-Appellee.*

No. 03-30355

D.C. No.
CR-00-00071-JAR

UNITED STATES OF AMERICA,
              *Plaintiff-Appellant,*

v.

JOSE LUIS ORTIZ-HERNANDEZ,
              *Defendant-Appellee.*

No. 03-30371

D.C. No.
CR-00-00071-JAR

UNITED STATES OF AMERICA,
              *Plaintiff-Appellant,*

v.

JOSE LUIS ORTIZ-HERNANDEZ,
              *Defendant-Appellee.*

No. 03-30356

D.C. No.
CR-02-00550-JAR

OPINION

Appeal from the United States District Court
for the District of Oregon
James A. Redden, District Judge, Presiding

Argued July 14, 2004
Submitted October 27, 2005
Portland, Oregon

Filed October 27, 2005

14799

Before: Thomas M. Reavley,* William A. Fletcher, and
Richard C. Tallman, Circuit Judges.

Per Curiam Opinion;
Dissent by Judge W. Fletcher

---

*Honorable Thomas M. Reavley, Senior United States Circuit Judge for
the Fifth Circuit, sitting by designation.

**COUNSEL**

Kent S. Robinson, Office of the United States Attorney, Portland, Oregon, for the appellant.

Paul Papak, Federal Public Defender's Office, Portland, Oregon, for the appellee.

**OPINION**

PER CURIAM:

The government charged defendant-appellee Jose Luis Ortiz-Hernandez with illegally reentering the United States in violation of 8 U.S.C. § 1326(a) and (b)(2). The government also charged Ortiz-Hernandez with violating the terms of his supervised release from a prior federal drug conviction by this illegal reentry. The two proceedings were consolidated in the district court. The district court suppressed fingerprint evi-

dence in both the criminal case and the supervised release proceeding. *United States v. Ortiz-Hernandez*, 276 F. Supp. 2d 1113 (D. Or. 2003). The district court then denied the government's motion to compel new fingerprint exemplars in the criminal case. *United States v. Ortiz-Hernandez*, 276 F. Supp. 2d 1119 (D. Or. 2003).

The government appeals both the suppression orders and the denial of its motion to compel fingerprint exemplars. In Ortiz-Hernandez's criminal case, we affirm the suppression order but reverse the denial of the government's request to compel another set of fingerprint exemplars. In Ortiz-Hernandez's supervised release case, we dismiss the appeal based on *United States v. Vargas-Amaya*, 389 F.3d 901 (9th Cir. 2004).

## I. Background

We rely for our factual narrative on the district court's view of the evidence and on uncontroverted evidence in the record. *See United States v. Vesikuru*, 314 F.3d 1116, 1119 (9th Cir. 2002) (findings of fact underlying the district court's ruling on a motion to suppress are reviewed for clear error). Most of the narrative is based on the testimony of Portland Police Bureau Detective Sergeant Dirk Anderson. The remainder is based largely on the testimony of Sergeant John Eckhart and Officer Jeffrey Becker.

Defendant-appellee Jose Luis Ortiz-Hernandez was arrested on November 12, 2002 in Portland, Oregon, by Detective Anderson on suspicion of drug dealing. Detective Anderson and his partner were eating lunch at a McDonald's restaurant in Portland when they saw the defendant and another man, later identified as Selmo Valenzuela, walking north on 82nd Avenue from Stark Street. Detective Anderson testified that he "believed" Ortiz-Hernandez was wearing a "purple shirt or sweatshirt of some type." Several minutes later, Detective Anderson thought he saw the same two men

drive past the McDonald's in a red Toyota 4-Runner. He testified that he saw two Hispanic-appearing men in the Toyota, and that he "believe[d] there was purple clothing in there as well." Detective Anderson saw the Toyota circling around the area of 82nd Avenue and Washington Street in a manner that led him to believe that the two men might be involved in drug sales.

After lunch, Detective Anderson and his partner were driving north on 82nd Avenue when they observed the Toyota parked in a Safeway grocery store parking lot. Detective Anderson saw Ortiz-Hernandez and Valenzuela walking toward the Safeway, away from the parked Toyota. Detective Anderson did not see them get out of the Toyota. Detective Anderson saw Ortiz-Hernandez and Valenzuela speak to "another Hispanic male," later identified as Wilfredo Alvarez-Quintana. Alvarez-Quintana then got into the Toyota. The driver and a Hispanic male passenger then drove the Toyota out of the parking lot.

Detective Anderson testified that despite a recent change eliminating the ability to "call back" on the public payphones at the Safeway, "there still are drug transactions that occur there daily." Detective Anderson testified that Ortiz-Hernandez and Valenzuela used the payphones "intermittently" at the Safeway. When a gray Jeep Cherokee arrived, Ortiz-Hernandez and Valenzuela spoke to the driver and passengers and got into the back seat. At that time, Detective Anderson still believed that Ortiz-Hernandez and Valenzuela had driven the Toyota to the Safeway and that Alvarez-Quintana and his passenger had then driven away in the same Toyota. This belief led Detective Anderson to conclude that the men in the Toyota were dealing drugs. He requested that an officer go to the Safeway to watch the Jeep Cherokee while he followed the Toyota.

When the Toyota stopped of its own accord at a nearby parking area, Detective Anderson got out to talk to the driver,

who identified himself as Wilfredo Alvarez-Quintana. Alvarez-Quintana said he was the only one who had driven the Toyota. He also told Detective Anderson that he and his nephew had driven to Portland from The Dalles, a city about 80 miles east of Portland on the Columbia River, and that he was "kind of lost." Alvarez-Quintana told Detective Anderson that he had spoken briefly at the Safeway parking lot with someone he mistakenly thought he knew. Detective Anderson searched the Toyota with Alvarez-Quintana's consent and found nothing illegal. He then allowed Alvarez-Quintana and his nephew to go on their way.

Meanwhile, Sergeant Eckhart was watching the Jeep Cherokee at the Safeway. He broadcast on the police radio that he was watching the Jeep from the "handicap spot," and that the Jeep was "on the northeast corner, Safeway." Sergeant Eckhart saw the driver and passengers, including Ortiz-Hernandez, talking with each other. He reported over the police radio that they were "making some kind of deal in there." When the Jeep drove out of the Safeway parking lot, the driver failed to use a turn signal. Sergeant Eckhart radioed for a marked police car to stop the Jeep. Officer Becker responded and pulled the Jeep over in front of a coffee shop. Officer Becker asked the driver for her license, proof of insurance, and registration. The driver identified herself as Marie Lewis. Her driver's license had been suspended.

Detective Anderson heard over the radio that the Jeep had been stopped and returned to investigate. There were five people in the Jeep. Lewis and an adult man, Dennis Urban, were in the front seats. Ortiz-Hernandez, Valenzuela, and Lewis's three or four-year-old nephew were in the back seat.[1] When Detective Anderson arrived, he had a brief conversation with Lewis in which she referred to Ortiz-Hernandez as "Juan."

---

[1]Detective Anderson testified to the presence of the boy in the back seat. Officer Becker, who had made the initial stop of the Jeep, could not remember seeing him.

Detective Anderson testified, "After my brief conversation with [Lewis], Sergeant Eckhart had also told me, prior to contacting the individuals, that it appeared that the defendant had swallowed, which is real common for street-level deliverers." Detective Anderson explained that street-level dealers sometimes keep drugs in balloons in their mouths and swallow them in order to avoid being caught with the drugs. He testified, "[T]hey remove them and sell them one at a time. And if confronted, they'll just swallow the balloons."

After his initial conversation with Lewis, Detective Anderson asked Ortiz-Hernandez and Valenzuela to get out of the Jeep. Because it was raining, he had them move inside the coffee shop. He asked for their names and birthdays. Ortiz-Hernandez claimed his name was Ruiz Perez-Cota,[2] and said that he was born on May 6, 1968. Detective Anderson asked Ortiz-Hernandez his age, and Ortiz-Hernandez gave an age that was "a year off" from the birth date he had given. At the suppression hearing, Detective Anderson could not remember the actual age Ortiz-Hernandez had given. He could remember only that it was "off."

Detective Anderson then returned to the Jeep. Lewis admitted she was on methadone but sometimes "chipping" with heroin. According to Detective Anderson, this meant that she was "cheating a little and still using a little heroin." Detective Anderson asked her if she had just purchased heroin from the defendant. Lewis denied it but admitted to the officer that she had done so in the past. She said that she had not seen him for a while and that she thought he had been "down in Mexico." Urban, the adult front seat passenger, had needlemarks on his arms. He told Detective Anderson that he was a recovering heroin addict.

---

[2]The transcript reads "Ruiz [phonetic] Perez Coda." The district court spelled the name "Ruiz Perez-Cota." *Ortiz-Hernandez*, 276 F. Supp. 2d at 1116. We follow the spelling used by the district court.

Detective Anderson went back into the coffee shop. He asked Ortiz-Hernandez if he had ever sold drugs. Ortiz-Hernandez said no. Detective Anderson then conducted a strip search of Ortiz-Hernandez in the coffee shop restroom and found no drugs or anything else that would have indicated that he was selling drugs. Detective Anderson examined the contents of Ortiz-Hernandez's wallet and found a Safeway card bearing the name of Miguel Valdez. Detective Anderson then formally placed Ortiz-Hernandez and Valenzuela under arrest for attempted delivery of a controlled substance.

After arresting Ortiz-Hernandez and Valenzuela, Detective Anderson returned to Lewis and told her that he could impound the Jeep and search it at the station because her license was suspended. She consented to a search at the scene instead. The officers found a syringe with unspecified drug "residue" under the front seat near her purse. The officers allowed Lewis, Urban, and the boy to leave in the Jeep. They gave Lewis a warning for failing to signal while turning. Detective Anderson explained to the district court that he had allowed Lewis to go free because "[p]rimarily we were interested in the dealers, and we thought we had the dealers."

Ortiz-Hernandez and Valenzuela were then taken to the police station. The officers ran the names "Ruiz Perez-Cota" and "Miguel Valdez," as well as various dates of birth, through the "local system" and the National Crime Information Center system without result. Detective Anderson then arranged for Ortiz-Hernandez to have a telephone interview with an Immigration and Naturalization Service (INS) agent. He testified that he set up the interview because he assumed that Ortiz-Hernandez "was most likely wanted." The interview produced no incriminating information. Detective Anderson then arranged for Ortiz-Hernandez to be fingerprinted at the Multnomah County Justice Center. When his fingerprints were run through the Automated Fingerprint Identification System, he was identified as Jose Luis Ortiz-Hernandez.

Once he knew Ortiz-Hernandez's true name, Detective Anderson was able to discover that Ortiz-Hernandez had a criminal record. Ortiz-Hernandez had a previous conviction for eluding examination and inspection by immigration officials, as well as convictions for drug possession and delivery. After serving a term of 30 months in prison, he had been placed on a one-year term of supervised release and had been deported to Mexico on May 3, 2002.

The state drug charges for which Detective Anderson had arrested Ortiz-Hernandez were later dropped. On December 5, 2002, a federal warrant and Order to Show Cause were issued alleging that Ortiz-Hernandez violated his supervised release by illegally reentering the United States. On December 17, 2002, Ortiz-Hernandez was indicted by a federal grand jury for illegal reentry in violation of 8 U.S.C. § 1326(a) and (b)(2).

The criminal case and supervised release proceeding were consolidated in the district court. The district court published two opinions. First, in both the criminal case and the supervised release proceeding, it suppressed the evidence of the fingerprints obtained at the Multnomah County Justice Center. *Ortiz-Hernandez*, 276 F. Supp. 2d 1113. Second, it denied the government's motion for a fingerprint exemplar in the federal criminal case. *Ortiz-Hernandez*, 276 F. Supp. 2d 1119. The government has timely appealed both rulings.

## II. The Criminal Case

The district court decided two questions in the criminal case brought under 8 U.S.C. § 1326(a) and (b)(2). First, should the fingerprint evidence taken by state officers at the Multnomah County Justice Center be suppressed? Second, should Ortiz-Hernandez be compelled to provide a second set of fingerprint exemplars to prove his identity at his federal trial? We address these questions in turn.

### A. Suppression of the Fingerprint Evidence

#### 1. Probable Cause

The district court held that Ortiz-Hernandez was arrested and taken into custody without probable cause. Because we cannot say that the district court's factual conclusions are clearly erroneous, we must agree with the district court's legal ruling.

**[1]** The existence of probable cause is a mixed question of law and fact. We review the legal conclusions de novo because "independent review is . . . necessary if appellate courts are to maintain control of, and to clarify, the legal principles" involved. *Ornelas v. United States*, 517 U.S. 690, 697 (1996) (citation omitted). Findings of fact underlying the district court's legal determinations are reviewed for clear error. *See United States v. Sandoval-Venegas*, 292 F.3d 1101, 1104 (9th Cir. 2002). We "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas*, 517 U.S. at 699. "Probable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime." *United States v. Buckner*, 179 F.3d 834, 837 (9th Cir. 1999) (internal quotation marks and citations omitted). Absent probable cause, a warrantless arrest is illegal. *Id.*

Police officers may rely on the totality of facts available to them when determining whether probable cause exists to make an arrest. For example, "[t]he experience and expertise of the officers involved in the investigation and arrest may be considered." *United States v. Hoyos*, 892 F.2d 1387, 1392 (9th Cir. 1989), *overruled on other grounds by U.S. v. Ruiz*, 257 F.3d 1030 (9th Cir. 2001). Officers may also consider the nature of the area as part of the calculus of suspicion, although it is not enough on its own to justify a stop or search. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Further,

providing conflicting information in response to police questions can be grounds for suspicion. *See United States v. Koshnevis*, 979 F.2d 691, 695 (9th Cir. 1992) (suspect's contradicting himself and nervousness were a part of the probable cause determination). If probable cause is established at any early stage of the investigation, it may be dissipated if the investigating officer later learns additional information that decreases the likelihood that the defendant has engaged, or is engaging, in criminal activity. A person may not be arrested, or must be released from arrest, if previously established probable cause has dissipated. "As a corollary . . . of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause." *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988); *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) (citation omitted) ("The continuation of even a lawful arrest violates the Fourth Amendment when the police discover additional facts dissipating their earlier probable cause.").

**[2]** We need not decide whether probable cause existed to detain and search Ortiz-Hernandez at the coffee shop. We assume there was reasonable suspicion to justify at least an initial inquiry into whether there was street-level drug dealing in progress. *See Terry v. Ohio*, 392 U.S. 1 (1968). The determinative question before us is whether there was probable cause when Ortiz-Hernandez was arrested and taken into custody by the Portland officers. When Detective Anderson formally arrested Ortiz-Hernandez, he knew that the men in the red Toyota 4-Runner were not Ortiz-Hernandez and Valenzuela, whom he had seen walking north on 82nd Avenue. He also could not show that the men in the Toyota were involved in drugs. He had observed Ortiz-Hernandez and Valenzuela talking on the payphones at Safeway. Despite a recent change resulting in an inability to call back on those payphones, this was still an area known for drug sales. Detective Anderson knew that Lewis, Urban, and Lewis's nephew had picked up

Ortiz-Hernandez in a Jeep Cherokee at the Safeway parking lot after they had talked on a payphone.

After interviewing Lewis, Urban, and Ortiz-Hernandez at the coffee shop, Detective Anderson had heard Lewis's statement that she had known Ortiz-Hernandez for some time, that she had not seen him for some time, and that she had purchased heroin from Ortiz-Hernandez in the past. He knew that Ortiz-Hernandez had denied selling drugs. He believed, because Ortiz-Hernandez stated an age that was a year "off" from the birthdate he provided, and because of the different name on the Safeway card in his wallet, that Ortiz-Hernandez had given him a false name. After his strip search of Ortiz-Hernandez in the coffee shop restroom revealed nothing incriminating, he knew that Ortiz Hernandez had no drugs, no drug paraphernalia, and no other evidence of drug sales on his person.

**[3]** In its appeal to us, the government emphasizes that Detective Anderson testified in the district court that Sergeant Eckhart had told him that he had seen Ortiz-Hernandez "swallow." He testified, "After my brief conversation with [Lewis], Sergeant Eckhart had also told me, prior to contacting the individuals, that it appeared that the defendant had swallowed, which is real common for street-level deliverers." The district court was skeptical of the truth of this statement and discounted it in assessing the evidence. The district court wrote:

> Anderson testified at the hearing that Eckhart told him "the defendant had swallowed," and that "[Eckhart] already believed that the defendant had swallowed the narcotics" while inside the Jeep. The prosecutor did not ask Eckhart if he had seen such a "swallowing motion." No effort was made by authorities to determine whether the defendant had, somehow, swallowed narcotics.

276 F. Supp. 2d at 1117. Detective Anderson's testimony in the district court was, of course, hearsay. Though admissible

in a suppression hearing, the district court did not have to believe the testimony. As the district court pointed out, the government could easily have asked Sergeant Eckhart, a testifying government witness, whether he had seen Ortiz-Hernandez swallow.

**[4]** Moreover, Detective Anderson's statement regarding Sergeant Eckhart's observations may not have resonated with the district court. Sergeant Eckhart reported to Detective Anderson that it "appeared" that Ortiz-Hernandez had swallowed some drugs while the Jeep was still in the Safeway parking lot. At that time, Ortiz-Hernandez was in the back seat of the Jeep. Unbeknownst to Ortiz-Hernandez, Sergeant Eckhart was observing from the "handicap spot" and the Jeep was at the northeast corner of the parking lot. The distance between the two vehicles is unspecified; Sergeant Eckhart may well have been limited in his ability to observe Ortiz-Hernandez. Importantly, Ortiz-Hernandez also had no reason to "swallow" at that time because he did not know that he was under observation. The district court was entitled to conclude that Sergeant Eckhart's purported statement was implausible.

**[5]** Finally, as the district court pointed out, there is no evidence in the record that the police took post-arrest measures, such as obtaining a body cavity search order, to confirm that Ortiz-Hernandez had swallowed balloons containing heroin. Nor is there evidence that the jailers inspected Ortiz-Hernandez's in-custody defecations for such balloons. Under these circumstances, we defer to the district court's skeptical view of Detective Anderson's testimony that Sergeant Eckhart saw Ortiz-Hernandez "swallow."

**[6]** Although the facts make this call a close one, we cannot say that the district court clearly erred when it ruled that considering the totality of evidence upon which Detective Anderson relied when he placed Ortiz-Hernandez under formal arrest, the evidence was insufficient to establish probable cause. After Ortiz-Hernandez was arrested, the officers

searched Lewis's Jeep and found the syringe containing some kind of drug "residue" under the front seat next to Lewis's purse. They reasonably believed that the syringe belonged to Lewis, and they found nothing else related to drugs or the drug trade in the Jeep. Thus, there was nothing that the police learned after Ortiz-Hernandez's arrest that supplied the proof that was lacking to establish probable cause when Ortiz-Hernandez had been arrested a few minutes before.

## 2. Use of the Initial Fingerprint Exemplars

The next issue is whether the initial fingerprint evidence obtained from Ortiz-Hernandez at the Multnomah County Justice Center after his illegal arrest must be suppressed. "We review de novo the mixed question of fact and law whether evidence deriving from an illegal search is sufficiently tainted to require suppression, because legal concepts must be applied and judgment exercised about the values that animate the Fourth Amendment." *United States v. Johns*, 891 F.2d 243, 244 (9th Cir. 1989); *see also United States v. Del Toro Gudino*, 376 F.3d 997, 998 (9th Cir. 2004) (reviewing de novo the question of whether fingerprint exemplars may be suppressed).

The district court concluded that Ortiz-Hernandez's fingerprints were taken for investigatory purposes, and therefore should be suppressed under *Hayes v. Florida*, 470 U.S. 811 (1985), and *Davis v. Mississippi*, 394 U.S. 721 (1969). The government contends, however, that Ortiz-Hernandez's fingerprints were taken only as a means of establishing his identity. As a result, it argues under *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984), that the fingerprints should not be suppressed. We agree with the district court.

**[7]** It is established law under *Hayes* and *Davis* that if fingerprints are taken for investigatory purposes, they must be suppressed in a criminal trial. We have followed *Hayes* and *Davis* in *United States v. Garcia-Beltran*, 389 F.3d 864 (9th

Cir. 2004), in which Garcia-Beltran was arrested in Portland, Oregon, without probable cause. Garcia-Beltran's fingerprints were taken after his arrest and enabled Portland police to determine Garcia-Beltran's identity. Once they knew his identity, the police were able to determine that he was an illegal immigrant. The government then charged Garcia-Beltran with illegal reentry into the United States in violation of 8 U.S.C. § 1326(a) and (b)(2). Garcia-Beltran moved in his criminal case to suppress the "fingerprint exemplars." *Id.* at 865. The precise circumstances under which Garcia-Beltran's fingerprints were taken are not clear from the record, so we remanded to the district court for factfinding. Because, on remand, the district court found that his fingerprints were taken in part for an investigatory purpose, they could not be used as evidence against him. *See id.*; *accord United States v. Guevara-Martinez*, 262 F.3d 751, 755 (8th Cir. 2001) (suppressing fingerprints taken for investigatory purposes after an illegal arrest).

[8] We affirm the district court's ruling suppressing the initial set of fingerprints based on an arrest without probable cause in violation of the Fourth Amendment in Ortiz-Hernandez's criminal case (No. 03-30355). The question then is whether the government is permitted to prove the identity of Ortiz-Hernandez in a subsequent charge of illegal reentry after deportation under 8 U.S.C. § 1326 by obtaining another set of fingerprints.

B.  Motion to Compel Another Set of Fingerprint Exemplars

The government moved in the district court to compel Ortiz-Hernandez to provide another set of fingerprint exemplars. The district court denied the motion on the ground that Ortiz-Hernandez's arrest was an "egregious" race-based violation of the Fourth Amendment and suppressed all identification evidence taken following the arrest. *Ortiz-Hernandez*, 276 F. Supp. 2d at 1122. This is an appealable order "excluding evidence" under 18 U.S.C. § 3731 and we reverse the dis-

trict court's ruling. Regardless of whether there was a race-based constitutional violation, Ortiz-Hernandez's identity may not be suppressed.**³**

**[9]** Over twenty years ago, the Supreme Court established the general rule that a criminal defendant cannot suppress his identity, even when there has been some prior illegality on the part of the government. *Lopez-Mendoza*, 468 U.S. at 1039. As the Supreme Court has declared: "The 'body' or identity of a defendant or respondent in a criminal or civil proceeding is *never* itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." *Id.* (emphasis added). We have reaffirmed that "[i]dentity evidence is inherently different from other kinds of evidence," and refused to suppress the defendant's identity in a 8 U.S.C. § 1326 prosecution even if it was "obtained as a result of an egregious constitutional violation." *Del Toro Gudino*, 376 F.3d at 1001 ("[W]hen [the Supreme Court] said the body or identity of a defendant is 'never' suppressible, it meant 'never.' ").

**[10]** While the original set of Ortiz-Hernandez's fingerprints should be suppressed as wrongfully obtained, the government is now aware of Ortiz-Hernandez's identity; it may rely on his identity, as well as his criminal and immigration record, in bringing § 1326 criminal charges against him. *See United States v. Guzman-Bruno*, 27 F.3d 420, 422 (9th Cir. 1994) (affirming the district court's conclusion that neither the defendant's "identity nor the records of his previous convictions and deportations could be suppressed as a result of the illegal arrest"); *accord United States v. Roque-Villanueva*,

---

**³**The record does not support the district court's conclusion that the arrest was an "egregious" race-based Fourth Amendment violation. Nonetheless, we need not address that issue because "[w]e continue to hold today that the simple fact of who a defendant is cannot be excluded, regardless of the nature of the violation leading to his identity." *Garcia-Beltran*, 389 F.3d at 868 (quoting *Del Toro Gudino*, 376 F.3d at 1001).

175 F.3d 345, 346 (5th Cir. 1999) (affirming the district court and refusing to suppress evidence of identity obtained in an illegal traffic stop, concluding that "[e]ven if the [d]efendant was illegally stopped, neither his identity nor his INS file are suppressible"). As we have previously articulated, "there is no sanction to be applied when an illegal arrest only leads to discovery of the man's identity and that merely leads to the official file or other independent evidence" being brought before the court. *Guzman-Bruno*, 27 F.3d at 422 (internal quotation and citation omitted).

[11] The government now may bring Ortiz-Hernandez to trial on the illegal reentry indictment and compel him to submit to another fingerprinting based on that arrest and arraignment and use the evidence for purposes of identification at trial. This result is consistent with and compelled by *United States v. Parga-Rosas*, 238 F.3d 1209 (9th Cir. 2001). The *Parga-Rosas* court concluded that, where initial fingerprint exemplars obtained as the fruit of an unconstitutional arrest were suppressed by the district court, a second set of fingerprints taken later after the defendant was indicted under 8 U.S.C. § 1326 was admissible because it was not taken for an investigative purpose. 238 F.3d at 1215 (citing *Guzman-Bruno*, 27 F.3d at 421). We know of no rule that prohibits rebooking on the new federal charge and processing the defendant under it, including fingerprinting and photographing during the subsequent booking. As was the case in *Parga-Rosas*, the government already knows Ortiz-Hernandez's identity. The new set of fingerprints the government now requests, after the federal grand jury indictment for a different offense has been returned, are not sought out of "an investigative purpose" but "serve only to further establish his identity." *See Garcia-Beltran*, 389 F.3d at 867 (considering *Parga-Rosas*, 238 F.3d at 1215).[4]

---

[4]The dissent would instead conclude that the fact that the initial set of fingerprints was suppressed because it was taken for investigatory pur-

Admittedly, our holding here limits the theoretical effect of suppressing the initial set of wrongfully obtained fingerprint exemplars, but this result is compelled by the nature of the evidence Ortiz-Hernandez is seeking to suppress—who he is. The Supreme Court has rejected applying the exclusionary rule to an individual's identity.[5] With or without the second

---

poses renders the government forever powerless to compel a new set of fingerprints for use in identifying Ortiz-Hernandez in the federal criminal prosecution for his new charge of being in violation of 8 U.S.C. § 1326. This ignores the clear import of our holding in *Del Toro Gudino*, where we unequivocally held that "a defendant's identity obtained as a result of an egregious constitutional violation" may not be suppressed. 376 F.3d at 1001.

Similarly, reliance on *Garcia-Beltran* is inapposite here. The *Garcia-Beltran* court considered only whether an initial set of fingerprints must be suppressed if obtained with an investigatory purpose. 389 F.3d at 867-68. There is no discussion of whether a second set of fingerprints could later be compelled to identify a defendant once he was under indictment. Only the *Parga-Rosas* court has addressed that issue, and we follow that approach here.

Finally, the government has no obligation in this appeal to show that it would have been able to identify Ortiz-Hernandez without the first set of fingerprints in order to bring him to trial—the government now knows his identity and that identity may never be suppressed. *See Lopez-Martinez*, 468 U.S. at 1039; *Guzman-Bruno*, 27 F.3d at 421-22.

[5]The dissent's disagreement with this proposition is curious, given the Supreme Court's clear language in *Lopez-Medina*. The dissent suggests that in a criminal proceeding the exclusionary rule requires the suppression of identity evidence obtained as a result of a Fourth Amendment violation. Dissent op. at 14826. While the dissent is correct to note that the general rule under the Fourth Amendment is to suppress unlawfully obtained evidence, the Court created a specific exclusion from that general rule for evidence of identity. *See Lopez-Medina*, 468 U.S. at 1039. The court held that "[t]he 'body' or identity of a defendant or respondent in a *criminal or civil proceeding* is never itself suppressible as the fruit of an unlawful arrest . . . ." *Id.* (emphasis added). Surprisingly, the dissent ignores this unambiguous language in arguing that all unlawfully obtained evidence must be excluded in a criminal proceeding. The Supreme Court has clearly articulated the rule: When it comes to identity evidence, no distinction between criminal and civil proceedings shall be made.

set of fingerprint exemplars, it is Ortiz-Hernandez's insuppressible identity, along with his continued illegal presence in this country, that connects him to the charged crime. It is true that the government would not have known Ortiz-Hernandez's identity without having unlawfully taken the first set of fingerprints, but that harm has no remedy under our case law beyond suppressing the initial fingerprints. *See Del Toro Gudino*, 376 F.3d at 1001; *Guzman-Bruno*, 27 F.3d at 422.

**[12]** We must also consider the nature of the crime Ortiz-Hernandez is facing—the continuing violation of federal law by his ongoing illegal presence in the United States. As we concluded in *Del Toro Gudino*, a constable's "blunder may allow the criminal to go free, but we have never suggested that it allows the criminal to continue in the commission of an ongoing crime." 376 F.3d at 1002 (quoting *Lopez-Mendoza*, 468 U.S. at 1047). Were Ortiz-Hernandez to be released, law enforcement officials immediately would have probable cause to re-arrest him based on their knowledge of his identity and his criminal and immigration records. *See Lopez-Mendoza*, 468 U.S. at 1047 (noting in a civil deportation context that if, after excluding evidence obtained in an unlawful arrest, the government were to release an unregistered alien, "[h]is release within our borders would immediately subject him to criminal penalties").

**[13]** To conclude otherwise would lead to an absurd result. Under our Circuit's law, "[t]he offense of being found in the United States ends when an alien is discovered and identified by the immigration authorities." *United States v. Hernandez*, 189 F.3d 785, 791 (9th Cir. 1999) (discussing being "found" in the United States for purposes of venue); *see id.* at 789 (citing cases from other circuits for a similar premise). In reaching that conclusion, we rejected the possibility that "a defendant may be found, over and over again, until the [authorities] physically arrest[ ] or deport[ ] the defendant[,]" and determined instead that the crime is limited to "a deported

alien [remaining] in the United States until he is 'found' by the authorities." *Id*. at 790-91 (noting that Congress did not generally criminalize "remaining in the United States"). *But see Guzman-Bruno*, 27 F.3d at 422-23 (declaring that a violation of 8 U.S.C. § 1326 "continues so long as the alien remains in the country").

**[14]** Ortiz-Hernandez has now been "found" by the authorities; his crime could be considered complete. Were we to conclude that, having discovered and identified Ortiz-Hernandez, the authorities are prevented from bringing him to trial, he could effectively be granted a form of judicial immunity because his continued presence after being "found" would no longer constitute a crime under 8 U.S.C. § 1326. Moreover, the statute of limitation begins to run from the date an alien is "found." *Hernandez*, 189 F.3d at 791. Under the dissent's approach, the government would have to release Ortiz-Hernandez (presumably granting him "safe conduct" en route to deportation) and then hope that it might arrest him again before the statutory time limit ran or he was deported beyond our jurisdictional reach. We reject this unreasonable result.

**[15]** If the government were forced to release Ortiz-Hernandez because the first set of fingerprint exemplars is suppressed, it would immediately have the authority to re-arrest and fingerprint him again in order to obtain the second set of fingerprint exemplars sought here for use in the new charge against Ortiz-Hernandez. No interest would be served, or fundamental right protected, by requiring the government to do this. Therefore, we conclude that the district court erred in denying the government's motion to compel Ortiz-Hernandez to provide a new set of fingerprint exemplars during pre-trial proceedings on the new federal charge.

### III. The Supervised Release Proceeding

Ortiz-Hernandez was originally sentenced to a one-year term of supervised release, which began on May 3, 2002. On

December 5, 2002, a warrant and Order to Show Cause was issued based upon the probation officer's statements that Ortiz-Hernandez had violated the conditions of his release. On May 3, 2003, Ortiz-Hernandez's supervised release term was set to expire, but the district court retained jurisdiction beyond that date pursuant to 18 U.S.C. § 3583(i).

While this case was on appeal, we held in *Vargas-Amaya*, 389 F.3d at 907, that a "district court's jurisdiction to revoke supervised release can be extended beyond the terms of supervision under 18 U.S.C. § 3583(i), based upon a warrant issued during the term of supervision, only if the warrant was issued 'upon probable cause, supported by Oath or affirmation,' as required by the Fourth Amendment." (quoting U.S. CONST. amend. IV). In this case, the warrant supporting the extension of Ortiz-Hernandez's period of supervised release was not based on an oath or affirmation. As a result, the district court's jurisdiction over the revocation of the supervised release ended on May 3, 2003. Accordingly, we dismiss the government's appeal related to the supervised release proceedings, and remand to the district court for appropriate disposition.

We AFFIRM the district court's suppression of Ortiz-Hernandez's fingerprints in his criminal case (No. 03-30355). We REVERSE the district court's denial of the government's motion to compel fingerprint exemplars in his criminal case (Nos. 03-30356, 03-30371). We DISMISS the appeal of Ortiz-Hernandez's supervised release proceeding in No. 03-30371. We REMAND for further proceedings consistent with this opinion.

---

W. FLETCHER, Circuit Judge, dissenting:

I respectfully dissent from Part II.B of the panel's opinion.

Detective Anderson of the Portland Police Department arrested and detained defendant Ortiz-Hernandez on a drug charge without probable cause. After taking Ortiz-Hernandez to the Multnomah County Justice Center in Portland, Detective Anderson did not pursue the drug charge. Rather, he systematically tried to find out whether Ortiz-Hernandez had violated the immigration laws. First, Detective Anderson ran the false names provided by Ortiz-Hernandez through various data bases without success. Second, Detective Anderson arranged for Ortiz-Hernandez to speak on the telephone with an INS agent. This interview produced no results. Finally, Detective Anderson took exemplars of Ortiz-Hernandez's fingerprints. Armed with the fingerprints, he finally hit pay dirt. He discovered Ortiz-Hernandez's true name and that he had violated the immigration laws.

We unanimously conclude that Detective Anderson took exemplars of Ortiz-Hernandez's fingerprints for "investigatory purposes," in violation of the Fourth Amendment. We therefore hold that the fingerprint exemplars cannot be introduced at trial. So far so good.

But after suppressing the fingerprint exemplars, the panel majority takes an inexplicable turn. The panel majority compels the production of a second set of exemplars. These compelled exemplars (unlike the suppressed exemplars) may be introduced at trial. In other words, the majority allows the government to accomplish with the second fingerprint exemplars precisely the same thing it holds the government cannot accomplish with the first.

In so holding, the majority brushes aside our recent decision in *United States v. Garcia-Beltran*, 389 F.3d 864 (9th Cir. 2004). Majority op. at 14817-18 n. 4. Garcia-Beltran, like Ortiz-Hernandez, was illegally arrested by an officer of the Portland Police Department. His fingerprints, like Ortiz-Hernandez's, were taken after arrest. Like Ortiz-Hernandez, he was subsequently charged with illegal entry. At Garcia-

Beltran's criminal trial, the district court admitted his "finger-print exemplars as evidence of his identity." *Id.* at 866. We reversed and remanded, holding that the fingerprint exemplars must be suppressed if they were taken for purely investigatory purposes. Our decision in *Garcia-Beltran* is good law, binding on this panel. The majority decision is flatly inconsistent with it. The majority may not like *Garcia-Beltran*, but the solution is to go en banc rather than to brush it aside.

## I. Established Law

It is established law under *Hayes v. Florida*, 470 U.S. 811 (1985), and *Davis v. Mississippi*, 394 U.S. 721 (1969), that fingerprints taken for purely investigatory purposes must be suppressed. It is also established law under *Wong Sun v. United States*, 371 U.S. 471 (1963), that not only evidence obtained in violation of the Fourth Amendment, but also evidence "come at by exploitation of the illegality," must be suppressed. *Id.* at 488. Under *Hayes*, *Davis*, and *Wong Sun*, this is a very simple case.

We all agree that Detective Anderson took Ortiz-Hernandez's fingerprint exemplars for an illegal investigatory purpose. We also agree that, because of the Fourth Amendment violation, the fingerprint exemplars must be suppressed. Further, it is undisputed that the exemplars taken by Detective Anderson led directly to the discovery that Ortiz-Hernandez could be charged with illegal reentry into the United States. Without the Fourth Amendment violation, Ortiz-Hernandez would not be standing trial for illegal reentry and the government would neither need nor want additional fingerprint exemplars.

## II. *INS v. Lopez-Mendoza*

The majority evades the established law of *Hayes*, *Davis*, and *Wong Sun* by its categorical assertion that "identity evidence" can "never" be suppressed. Majority op. at 14816. For

that assertion, it relies on a single sentence by the Supreme Court in *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039-40 (1984):

> The "body" or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred. See *Gerstein v. Pugh*, 420 U.S. 103, 119 (1975); *Frisbie v. Collins*, 342 U.S. 519, 522 (1952); *United States ex rel. Bilokumsky v. Tod*, [263 U.S. 149,] 158 [(1923)].

The majority misreads this sentence and misunderstands *Lopez-Mendoza*. Far from supporting the majority's conclusion, *Lopez-Mendoza* directly conflicts with it.

There were two respondents in *Lopez-Mendoza*. The quoted sentence is relevant only to the first of them, Lopez-Mendoza. After an illegal arrest, Lopez-Mendoza was placed in deportation proceedings. The immigration judge, relying on a familiar and established rule, held that the illegality of Lopez-Mendoza's arrest could not be used as a defense in his deportation proceeding. *Id.* at 1035. The Supreme Court made quick work of Lopez-Mendoza's argument to the contrary in the single sentence just quoted, invoking the same rule upon which the immigration judge had relied.

The three cases cited by the Court in support of its sentence all refer to and rely on this same established rule. In *Gerstein*, at the page cited in *Lopez-Mendoza*, the Court wrote, "Nor do we retreat from the established rule that an illegal arrest or detention does not void a subsequent conviction. *Frisbie v. Collins*, 342 U.S. 519 (1952)[.]" 420 U.S. at 119. In *Frisbie*, at the cited page, the Court wrote, "This Court has never departed from the rule . . . that the power of a court to try a person for a crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible

abduction.' " 342 U.S. at 522. Finally, in *Bilokumsky*, at the cited page, the Court wrote, "Irregularities on the part of the Government official prior to, or in connection with, the arrest would not necessarily invalidate later proceedings in all respects conformable to law." 263 U.S. at 158.

There is no hint in *Lopez-Mendoza* that the quoted sentence was intended to go beyond the familiar and established rule. There is certainly no hint that the sentence was intended to articulate a categorical new rule, that evidence of the identity of a criminal defendant could always be introduced in court regardless of its source. This was not the issue in *Lopez-Mendoza*. Nor was it the issue in *Gerstein*, *Frisbie*, and *Bilokumsky*. The question in those cases was whether a defendant could assert as a defense in a deportation or a criminal case that he had been illegally arrested. The answer, under long-established law, was "no."

The second respondent in *Lopez-Mendoza* was Sandoval-Sanchez. His case is directly comparable to the case now before us. Sandoval-Sanchez was arrested in an immigration sweep conducted by the Immigration and Naturalization Service (INS). After his arrest, Sandoval-Sanchez stated his name to INS investigators and admitted that he had re-entered the country illegally. At his civil deportation hearing, he contended that his arrest had been illegal. He therefore challenged the admission of the Form I-213 on which his name, as well as his illegal re-entry, were recorded. Petition for Writ of Certiorari at 111a, *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984) (No. 83-491). That is, Sandoval-Sanchez did not merely challenge the legality of his arrest. Rather, he challenged the admission of evidence — including evidence of his identity (his name) — obtained as a result of the illegal arrest. The Supreme Court explicitly recognized the difference between his challenge and Lopez-Mendoza's. It wrote, "Respondent Sandoval-Sanchez has a more substantial claim. He objected not to his compelled presence at a deportation, but to evidence offered at that proceeding." 468 U.S. at 1040.

The Court held that the challenged evidence, including evidence of Sandoval-Sanchez's identity, was admissible. But the Court held that it was admissible only because Sandoval-Sanchez was appearing in a civil deportation hearing. In a lengthy discussion, the Court described the ways in which a civil deportation proceeding is different from a criminal trial. Based on these differences, it concluded that the Fourth Amendment exclusionary rule does not apply in a deportation proceeding: "In these circumstances, we are persuaded that the . . . balance between costs and benefits comes out against applying the exclusionary rule in civil deportation proceedings held by the INS." *Id.* at 1050.

However, the Court was explicit in saying that the evidence contained in Sandoval-Sanchez's Form I-213 would have been properly suppressed if it had been a criminal proceeding. Citing *Wong Sun*, the Court wrote, "The general rule in a criminal proceeding is that statements and other evidence obtained as a result of an unlawful, warrantless arrest are suppressible if the link between the evidence and the unlawful conduct is not too attenuated." *Id.* at 1040-41. If the proceeding is criminal, the exclusionary rule requires the suppression of identity evidence obtained as a result of the Fourth Amendment violation. But if the proceeding is a civil deportation hearing, the evidence is admissible. As the Court wrote, "When the crime in question involves unlawful presence in this country, *the criminal may go free*, but he should not go free within our borders." *Id.* at 1047 (emphasis added).

The conclusion reached by the majority in this case is thus not supported by *Lopez-Mendoza*. Quite the opposite. The sentence upon which the majority relies was applied to Lopez-Mendoza's case, where the only issue was whether a defendant could defend against deportation based on his illegal arrest. The Court gave the established answer: When a defendant's only defense is the illegality of his arrest, he cannot suppress his " 'body' or identity." *Id.* at 1039. By contrast, in Sandoval-Sanchez's case, where the issue was whether a

criminal defendant could object to the introduction of illegally obtained evidence (including identity evidence) in a criminal proceeding, the answer was quite different: Any illegally obtained evidence (including identity evidence) must be suppressed. As the Court wrote, in differentiating Sandoval-Sanchez's case from Lopez-Mendoza's, "[Sandoval-Sanchez] objected not to his compelled presence at a deportation proceeding, but to evidence offered at that proceeding." *Id.* at 1040.

In *United States v. Guevara-Martinez*, 262 F.3d 751, 753, 754 (8th Cir. 2001), the Eighth Circuit carefully analyzed *Lopez-Mendoza* and came to the same conclusion:

> In the jurisdictional case (Lopez-Mendoza), the Court said that the "body or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as the fruit of an unlawful arrest." [468 U.S. at 1039] But the Court addressed the evidentiary case (Sandoval-Sanchez) from a different tack. There the Supreme Court acknowledged the "general rule in a criminal proceeding [ ] that statements and other evidence obtained as a result of an unlawful, warrantless arrest *are suppressible* if the link between the evidence and the unlawful conduct is not too attenuated." Id. at 1040-41 . . . (emphasis added). Thus, the Court's reference to the suppression of identity appears to be tied only to a jurisdiction issue, not to an evidentiary issue.

> \* \* \*

> We conclude that Lopez-Mendoza's statement about the suppression of identity only refers to jurisdictional challenges, not to fingerprint evidence challenged in a criminal proceeding.

To the same effect are *United States v. Olivares-Rangel*, 324 F. Supp. 2d 1218, 1224 (D.N.M. 2004) (explicitly following

the Eighth Circuit's decision in *Guevara-Martinez*); *United States v. Mendoza-Carrillo*, 107 F. Supp. 2d 1098, 1106, 1007 (D.S.D. 2000) ("The language in *Lopez-Mendoza* should only be interpreted to mean that a defendant may be brought before a court on a civil or criminal matter even if the arrest was unlawful." "This Court will not read the language of *Lopez-Mendoza* to preclude the suppression of fingerprints[.]").

## III. Ninth Circuit Cases

The majority relies on three decisions of this court and brushes aside a fourth, more recent decision. The three decisions upon which the majority relies misunderstand the " 'body' or identity" sentence from *Lopez-Mendoza*, just as the majority misunderstands that sentence. Of course, a three-judge panel does not have the power to overrule these decisions, and I must, for present purposes, accept these three decisions of our circuit as binding law. But these three decisions do not go as far as the majority goes in this case. The fourth decision, which the majority brushes aside, distinguishes and limits the reach of the first three decisions. In my view, the fourth decision is flatly inconsistent with the decision reached by the majority. Absent an en banc proceeding, the majority is bound by that fourth decision, just as we are bound by the first three.

I begin by discussing the three decisions that misunderstand the " 'body' or identity" sentence from *Lopez-Mendoza*. First, in *United States v. Guzman-Bruno*, 27 F.3d 420 (9th Cir. 1994), Guzman-Bruno was arrested by agents of the INS. For purposes of our decision, we assumed that the arrest was illegal. After his arrest, Guzman-Bruno admitted his name, and admitted that he had prior drug convictions and deportations. We refused to suppress evidence of Guzman-Bruno's identity in his later criminal prosecution for illegal reentry. We wrote:

> A defendant's identity need not be suppressed merely because it is discovered as the result of an

illegal arrest or search. . . . "The 'body' or identity
of a defendant . . . is never itself suppressible as a
fruit of an unlawful arrest." *INS v. Lopez-Mendoza*,
468 U.S. 1032, 1039 (1984)[.] 27 F.3d at 421-22.

Second, in *United States v. Parga-Rosas*, 238 F.3d 1209
(9th Cir. 2001), Parga-Rosas was arrested by San Diego
police. Upon later questioning by the United States Border
Patrol, Parga-Rosas admitted that he was here illegally. After
Parga-Rosas admitted his crime, the Border Patrol took fin-
gerprint exemplars and discovered his identity. Citing
*Guzman-Bruno*, we held that because his fingerprints had not
been taken to investigate whether he had committed a crime
but rather merely to establish his identity, they could be
admitted in criminal trial. *Id.* at 1215.

Third, in *United States v. Del Toro Gudino*, 376 F.3d 997
(9th Cir. 2004), Del Toro Gudino was arrested by the United
States Border Patrol. After his arrest, Del Toro Gudino admit-
ted that he was here illegally. The Border Patrol thus knew,
based on Del Toro Gudino's own admission, that he had com-
mitted a crime. In order to learn his name, the Border Patrol
then took fingerprint exemplars. Del Toro Gudino sought to
have the fingerprint evidence suppressed on the ground that
he had been illegally arrested. Citing the Supreme Court's
sentence in *Lopez-Mendoza* and our decision in *Guzman-
Bruno*, we held that this evidence of identity could not be sup-
pressed.

The majority brushes aside our more recent decision,
*United States v. Garcia-Beltran*, 389 F.3d 864 (9th Cir. 2004).
Garcia-Beltran was arrested without probable cause by Port-
land police. After his arrest, exemplars of his fingerprints
were taken. Garcia-Beltran contended that the exemplars had
been taken for purely investigatory purposes. The government
argued that it did not matter whether the exemplars were
taken for investigatory purposes because identity evidence
could always be introduced at trial. The government relied on

the Supreme Court's decision in *Lopez-Mendoza*, and our decisions in *Guzman-Bruno*, *Parga-Rosas*, and *Del Toro Gudino*. We rejected the government's argument.

We characterized *Guzman-Bruno*, *Parga-Rosas*, and *Del Toro Gudino* as holding that, when the government already knows that the defendant has committed a crime, and only takes his fingerprints to discover his identity, the fingerprint evidence may not be suppressed. We held that *Guzman-Bruno*, *Parga-Rosas*, and *Del Toro Gudino* do not control a case where the government takes fingerprint exemplars for investigatory purposes, in order to discover whether the person has committed a crime. *Beltran-Garcia* is on all fours with the case now before us.

The majority contends that *Garcia-Beltran* does not control because it involved suppressing the original fingerprint exemplars taken by the Portland police, and did not involve compelling the production of a second set of exemplars. This is a classic example of a distinction without a difference. In practical effect, the majority holds that the fingerprint evidence seized in violation of the Fourth Amendment can never be suppressed.

Under the majority's opinion, law enforcement officers may arrest without probable cause any person who they think might possibly have committed a crime. They may suspect a person with a gun of being a convicted felon. Or they may suspect a Hispanic-looking person of being an illegal immigrant. They may take the fingerprints of this person to discover his or her name, and thereby learn his or her status and whether he or she has committed a crime.

Under the majority's decision, the formalities would, of course, be observed. The original fingerprints could not be introduced, for that — heaven forbid — would violate the exclusionary rule. Instead, a second set of fingerprints, made available through a motion to compel, would be introduced.

Same fingers, but different fingerprints. In practical effect, the Fourth Amendment and the exclusionary rule would be rendered meaningless. More to the immediate point, our recent decision in *Garcia-Beltran* would be eviscerated.

## IV. Continuing Crime

The majority argues in support of its result that Ortiz-Hernandez's crime is different from ordinary crimes. It writes, "We must also consider the nature of the crime Ortiz-Hernandez is facing — the continuing violation of federal law by his ongoing presence in the United States." Majority op. at 14819. This argument was made, and explicitly rejected, in *Lopez-Mendoza*. The Supreme Court noted that release of Sandoval-Sanchez within the borders of this country "would clearly frustrate the express public policy against an alien's unregistered presence in this country." 468 U.S. at 1047. For this, among other reasons, the Court held that the exclusionary rule does not apply in civil deportation proceedings. Under the Supreme Court's opinion in *Lopez-Mendoza*, Sandoval-Sanchez could be deported despite the Fourth Amendment violation, just as Ortiz-Hernandez, the defendant in this case, may be deported.

But the Court in *Lopez-Mendoza* rejected the conclusion that the ongoing nature of Sandoval-Sanchez's immigration violation required the elimination of the exclusionary rule in criminal proceedings. The nature of the immigration crime required the deportation of the illegal alien. But it did not require the elimination of the exclusionary rule to allow him to be criminally convicted. Responding directly to the concern expressed by the majority, the Court wrote in *Lopez-Mendoza*, "When the crime in question involves unlawful presence in this country, *the criminal may go free, but he should not go free within our borders*." 468 U.S. at 1047 (emphasis added).

## V. Egregious Fourth Amendment Violation

Finally, relying on *Del Toro Gudino*, the majority states that the second set of fingerprint exemplars could be com-

pelled even if Detective Anderson's violation of the Fourth Amendment were egregious and race-based. Majority op. at 14815-16. This statement ignores the Court's explicit caution in *Lopez-Mendoza*, in discussing Sandoval-Sanchez's case, that evidence seized pursuant to an egregious violation of the Fourth Amendment might be suppressed even in a deportation proceeding. The Court carefully noted that it was not dealing with "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained," 468 U.S. at 1050-51, and that its holding was limited to non-egregious violations. If the Court was concerned in *Lopez-Mendoza* to reserve the question of whether evidence seized pursuant to an egregious Fourth Amendment violation could be introduced in a civil deportation proceeding where the exclusionary rule does not apply, how can we blithely assume that evidence seized pursuant to an egregious, race-based violation can be admitted in a criminal proceeding? With this case in its current posture, I am bound by *Del Toro Gudino*, but an en banc court would of course be free to reconsider that holding.

## Conclusion

This panel unanimously agrees that Detective Anderson's purely investigatory search violated the Fourth Amendment. We also unanimously agree that the fingerprint exemplar taken by Detective Anderson must be suppressed. But the panel majority compels the production of a second fingerprint exemplar even though it has suppressed the first one. This decision conflicts with the Supreme Court's decision in *Lopez-Mendoza*, with the Eighth Circuit's decision in *Guevara-Martinez*, and with our decision in *Garcia-Beltran*. I respectfully but emphatically dissent.