UNITED STATES of America,
Plaintiff,

v.

Jose ORTIZ–HERNANDEZ, Defendant.

No. CR.02–550–RE, 00–071–RE.

United States District Court,
D. Oregon.

July 7, 2003.

Michael Mosman, United States Attorney, District of Oregon, Claire M. Fay, Assistant United States Attorney, Portland, OR, for United States.

Paul Papak, Assistant Federal Public Defender, Portland, OR, for defendant.

### AMENDED OPINION AND ORDER

REDDEN, District Judge.

Defendant Jose Ortiz–Hernandez moves to suppress the fingerprints and subsequent identification that form the basis for his indictment for violation of 8 U.S.C. §§ 1326(a) and (b)2) (illegal re-entry) and supervised release violation. The motion is granted.

### Procedural Background

In February 2000, the defendant was indicted on one count of illegal reentry after having been deported, one misdemeanor count of eluding examination and inspection by immigration officials, and one felony count of eluding examination and inspection. On May 1, 2000, the defendant pleaded guilty to counts two and three. He was sentenced to 30 months in prison, a fine, and one year of supervised release. He was deported for a second time on May 3, 2002.

On November 12, 2002, the defendant was found in Portland, Oregon. On December 5, 2002, a Warrant and Order to Show Cause was issued, alleging that the defendant had violated the terms of his supervised release by illegally reentering the United States and by failing to report to his probation officer. On December 17 he was again indicted for illegal reentry. The supervised release case and the current illegal reentry case have been consolidated.

The court held an evidentiary hearing on the defendant's motion to suppress June 6, 2003. After the hearing, the court requested supplemental briefing, submitted on June 13, 2003.

### Facts

On November 12, 2002, at about 12:15 p.m., Portland Police Detective Dirk Anderson and his partner, Detective Pitton, were eating lunch at McDonald's near SE 82nd and Stark in Portland. Anderson saw the defendant and another man, later identified as Selmo Valenzuela, walking northbound on 82nd Avenue from Stark. Shortly thereafter, while still at the McDonald's, Anderson thought he saw the same two men in a 1994 Toyota Four Runner, pulling away on to 82nd, going northbound. Anderson testified that he had seen the Toyota earlier, circling around the area of 82nd and Washington Street. Anderson testified that with his training and experience, he knew people wishing to purchase or sell drugs congregated in that area, and "lower level" drug deals were done from cars circling through residential blocks. Anderson and Pitton left and drove northbound on 82nd Avenue, where Anderson happened to see the Toyota in the parking lot of a Safeway on SE 82nd, about five blocks from McDonald's.

Anderson testified that he saw the defendant and Valenzuela walking in a direction away from the Toyota and toward the Safeway. Anderson saw them speak briefly to "another Hispanic male," subsequently identified as Wilfredo Alvarez–Quintana. Anderson saw Alvarez–Quintana get into the Toyota.

Anderson then saw the defendant and Valenzuela using and waiting near the public telephones at the Safeway. Anderson testified that "there's a lot of [drug] deals right there on the corner of 82nd and Burnside," near these tele-

phones. A gray Jeep pulled up next to the defendant and Valenzuela and they spoke to the occupants, then climbed into the back seat. The driver of the Jeep was Marie Lewis. Her companion was Dennis Urban. Lewis' young nephew was also in the Jeep.

Anderson decided to follow and detain the Toyota while other officers kept the defendant and Valenzuela under surveillance. Anderson concluded, and told his fellow officers, that the defendant and Valenzuela "were the ones originally driving this rig" (i.e., the Toyota) and that the "dope [was] rolling" in the Toyota, which was now being driven by a different "two Hispanics."

Anderson, however, was mistaken on all counts. Defendant and Valenzuela had never been inside the Toyota and were not acquainted with Alvarez–Quintana. The "two Hispanics" in the Toyota were Alvarez–Quintana, and his nephew, residents of The Dalles, who were in Portland on routine business.

At Anderson's request, Sgt. John Eckhart of the Portland Police Bureau went to the Safeway to observe the Jeep while Anderson went after the Toyota. Alvarez–Quintana stopped the Toyota of his own accord on Stark Street, east of I–205. Anderson approached the car and asked Alvarez–Quintana about the events in the Safeway parking lot. Alvarez–Quintana told Anderson he had been the only one to drive the Toyota. Alvarez–Quintana said he had briefly greeted someone he thought he knew in the Safeway parking lot. When Anderson asked why the Toyota was circling the neighborhood around SE 82nd, Alvarez–Quintana responded that he had been lost. Anderson testified that Alvarez–Quintana was "very cooperative and not nervous at all." Nevertheless, Anderson asked to search the Toyota. Alvarez–Quintana consented. No contraband was found, and Anderson permitted Alvarez–Quintana to depart. Alvarez–Quintana so testified as a defense witness.

Eckhart continued to observe the Jeep. He testified that he could see people "moving around, as if they were talking, or something, between the front seat and the back seat," and could tell that there were four or five people in the Jeep. When asked what he meant by "moving around," Eckhart testified that he could see heads moving from side to side, but he could not see whether there were hand motions.

After a few minutes, Eckhart saw the Jeep drive around the front of the Safeway and leave the parking lot, going southbound on 82nd Avenue. Eckhart testified that Lewis failed to use a turn signal as she left the parking lot. Eckhart, who was undercover and driving an unmarked car, followed the Jeep. Anderson testified that Eckhart told him they were going to stop the driver for failure to signal a turn to "give us an opportunity to investigate the possible drug transaction occurring." Anderson left to join the officers following the Jeep.

Portland Police Officer Jeffrey Becker responded to Eckhart's request for a uniformed officer to stop the Jeep. He pulled the Jeep over near a coffee shop called Mocha Express, approximately 20 blocks from the Safeway. Becker approached Lewis, requesting her license, proof of insurance and registration. Lewis' license had been suspended. She identified the other occupants of the Jeep. Eckhart stood at the back of the Jeep to render assistance if needed. Anderson arrived within a few minutes and asked Lewis how long she had known the defendant and Valenzuela. She had known them for a long time.

Anderson ordered the defendant and Valenzuela out of the car. It had begun to rain, and they moved inside Mocha Express. Anderson asked the defendant and Valenzuela their names and what they

were doing. The defendant said he was Luis Perez–Cota and Valenzuela gave his true name. Anderson asked the defendant his birthday, which he gave as May 6, 1968. Anderson asked the defendant his age, and testified that the age given did not correspond to the birth date because it was "one year off."

Anderson returned to the car and asked Lewis if she had a drug problem. She said she was on methadone, but admitted that she was also using heroin on occasion. Anderson asked if she was buying heroin from the defendant and Valenzuela and she said she was not. Anderson testified that Lewis said she bought heroin from the defendant several years earlier, but had not seen him recently. Urban told Anderson that he, too, was a recovering heroin addict.

Anderson then went back inside the Mocha Express and asked the defendant if he had ever sold drugs. The defendant denied it. Anderson then took the defendant into the restroom and conducted an invasive strip search. He found no contraband on the defendant's person. Anderson also searched the defendant's wallet. He found a Safeway card with the name Miguel Valdez on it and a piece of paper with "Marie" (Lewis' first name) and a phone number written on it.

Anderson formally arrested the defendant and Valenzuela for attempted delivery of a controlled substance. He then told Lewis that because her license was suspended, the police could tow the car and do an inventory search. She elected to consent to the car search on the spot. The search revealed a syringe with residue near Lewis' purse, under the front seat. Lewis was not cited for failure to signal a turn or for driving while suspended. She and Urban were allowed to leave.

Officer Becker transported the defendant to East Precinct. The officers ran the name given them by the defendant, but the computers were "unable to locate." Anderson tried different combinations of the Perez–Cota and Valdez names with the same result. Anderson then called the Immigration and Naturalization Service (INS) and arranged for an INS telephone interview of the defendant. There was no testimony on whether anything relevant was obtained from the INS interview. The defendant was then taken to the Multnomah County Justice Center, where he was fingerprinted. The fingerprints were run through the Automated Fingerprint Indexing System, and he was identified as Jose Luis Ortiz–Hernandez.

### Analysis

1. *Was there probable cause to arrest defendant?*

 To have probable cause to arrest without a warrant, the officer must "know reasonably trustworthy information sufficient to warrant a prudent person in believing that the suspect has committed a crime." *United States v. Butler*, 74 F.3d 916, 920 (9th Cir.1996). Anderson's belief that drug activity was occurring with the Toyota Four Runner was completely unfounded. Anderson's belief that the defendant or Valenzuela was connected to the Toyota Four Runner was also baseless.

At the time the Jeep was stopped, Anderson knew that his suspicions about the Toyota Four Runner had been groundless. Apart from the events surrounding the Toyota, he had observed the following: 1) the defendant and Valenzuela walking to the Safeway parking lot; 2) one of the two men using the phone and standing near it; 3) the two men walking over to the Jeep, chatting with the occupants and getting in; and 4) driving away. Nothing in these observations could justify the belief by a prudent person that the defendant or Valenzuela had committed or was about to commit a crime.

Anderson testified at the hearing that Eckhart told him "the defendant had swallowed," and that "he [Eckhart] already believed that the defendant had swallowed the narcotics" while inside the Jeep. The prosecutor did not ask Eckhart if he had seen such a "swallowing motion." No effort was made by authorities to determine whether the defendant had, somehow, swallowed narcotics.

Anderson testified that when he took the defendant inside the Mocha Express he was not in "physical custody," but was not free to leave. Anderson learned that Lewis and Urban were heroin users who had bought heroin from the defendant years earlier. Anderson strip-searched the defendant but found nothing on the defendant's person to suggest drug activity—no drugs, drug paraphernalia, balloons, weapons, significant amounts of cash, cell phones, or transaction records. The search of the Jeep revealed no drugs. The drug paraphernalia found in the Jeep had been claimed by Lewis and Urban.

 The defendant's mere presence with known drug offenders is insufficient to give probable cause for an arrest. *Sibron v. New York*, 392 U.S. 40, 62–63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)(police lacked probable cause to arrest defendant found talking to narcotics addicts and traffickers); *United States v. Soyland*, 3 F.3d 1312, 1314 (9th Cir.1993) (police lacked probable cause to search automobile passenger when passenger was merely present in a car and driver admitted possession for personal use). Anderson's disbelief of the defendant's purported birth date is insufficient to support probable cause to believe that he had committed the crime of attempting to distribute controlled substances.

 A stop or arrest based solely on a defendant's Hispanic appearance is unconstitutional. See, e.g., *United States v. Brignoni–Ponce*, 422 U.S. 873, 886–87, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) ("Hispanic appearance alone is insufficient to justify a stop"); *Nicacio v. INS*, 797 F.2d 700, 703 (9th Cir.1985) ("Hispanic-looking appearance and presence in an area where illegal aliens frequently travel are not enough to justify a stop to interrogate the occupants of a vehicle"). I find that the stop, arrest and search of the defendant were based at least in part on his race. It is hard to envision the arrest and treatment of the defendant had he been a non-Hispanic walking to and using a public telephone outside a large public grocery store in the middle of the afternoon, then being picked up in a car. It is also suspicious that the police showed no interest in Lewis, a non-Hispanic, who failed to signal a turn, was driving with a suspended license, and was an admitted heroin addict in possession of drug paraphernalia.

If the defendant's race was not the sole motivating factor, his arrest was nevertheless clearly illegal. After the search of two cars and the strip-search of the defendant, the police found nothing incriminating. They arrested him anyway.

2. *Despite the absence of probable cause, do the defendant's fingerprints constitute "identity" evidence that cannot be suppressed?*

 The defendant argues that under *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) and *Hayes v. Florida*, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), his statements and fingerprints are the fruits of the illegal arrest and must be excluded. The prosecution asserts that even if the defendant's arrest was without probable cause, his fingerprints cannot be excluded because identity cannot be suppressed.

In *Davis* and *Hayes*, the Supreme Court held that fingerprint evidence obtained as a result of constitutional violations and used for investigatory purposes must be

suppressed in criminal investigations. In *Davis*, the defendant's fingerprints were obtained on two separate occasions, the first involving an illegal detention of the defendant and several other young black men for the sole purpose of obtaining fingerprints, at which the defendant was also interrogated, and the second after an arrest and ensuing detention that were based on neither a warrant nor probable cause. 394 U.S. at 725–27, 89 S.Ct. 1394. The state argued that the Fourth Amendment did not prohibit an investigative detention for the purpose of fingerprinting, even in the absence of probable cause or a warrant. The Court rejected the argument, holding that Davis' detention for the purpose of fingerprinting was subject to the constraints of the Fourth Amendment and the fingerprints should therefore have been excluded.

In *Hayes*, the defendant was taken to the station and fingerprinted, where it was determined that his prints matched those taken at the scene of the crime. The defendant was then arrested. The Court held that the defendant's detention in the absence of a warrant, probable cause or consent violated the Fourth Amendment.

The *Hayes* Court reaffirmed *Davis*, 470 U.S. at 814–15, 105 S.Ct. 1643, and several subsequent cases, holding that the lines drawn by the Fourth and Fourteenth Amendments are "crossed when the police, without probable cause or a warrant, forcibly remove a person from ... [the] place where he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes." *Id.* at 816, 105 S.Ct. 1643.

The prosecution urges that the defendant's fingerprints constituted no more than proof of his identity and therefore cannot be suppressed, relying on *INS v. Lopez–Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), *United States v. Guzman–Bruno*, 27 F.3d 420 (9th Cir.

1994) and *United States v. Parga–Rosas*, 238 F.3d 1209 (9th Cir.2001).

In *Lopez–Mendoza*, the issue was whether the alien's name could be suppressed. The Court noted that the "body" or identity of a defendant in a criminal or civil proceeding is never itself suppressible as the fruit of an unlawful arrest, 468 U.S. at 1039, 104 S.Ct. 3479, without further elaboration. The point of the Court's decision was whether the exclusionary rule applied to civil proceedings, such as deportations.

*Guzman–Bruno*, like *Lopez–Mendoza*, dealt only with the question of whether a defendant's admission of his name can be suppressed. The court relied on the sentence in *Lopez–Mendoza* and on another Court of Appeals case, *United States v. Foppe*, 993 F.2d 1444, 1449 (9th Cir.1993), which held that suppression of incidental observations by police, such as a defendant's appearance, would not deter illegal police activity. 27 F.3d at 422.

*Parga–Rosas* involved the suppression of fingerprints. There the court held that "the fingerprints were not taken for investigatory purposes but for the sole purpose of proving Parga–Rosas' identity." 238 F.3d at 1214. The court correctly concluded that the Fourth Amendment was not implicated. *Id.*

The holding in *Parga–Rosas* does not control this case because in *Parga–Rosas* a prosecution was pending when the defendant's fingerprints were taken. Here, the fingerprints were taken *for investigatory purposes*.

The evidence establishes that the police had no evidence that the defendant had been attempting to distribute controlled substances. Once he was in custody they made no further attempt to obtain evidence of drug activity. Rather, they sought to discover grounds for other charges. They ran the defendant's aliases and birth date through various computer

databases, had him interviewed in Spanish by an INS agent, and then fingerprinted him. The defendant's fingerprinting was not merely a means of proving his identity. It was part of the police investigation of possible crimes with which the defendant could be charged.

Because the defendant's fingerprints were obtained for investigative purposes this case is controlled by *Davis* and *Hayes*, not *Parga–Rosas*. The fingerprints are excluded as the fruits of the illegal arrest.

### Conclusion

The defendant's arrest was illegal because it was unsupported by probable cause. The defendant's fingerprints, used to establish his identity, were obtained by exploiting that illegal arrest and for investigative purposes. The fingerprints therefore constitute the "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ The exclusionary rule is a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); see also *United States v. Ceccolini,* 435 U.S. 268, 275, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978) ("Recognizing not only the costs, which are often substantial, of the exclusionary rule, we have said that 'application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served.' ")

The defendant's motion to suppress (doc. # 14) is GRANTED.

IT IS SO ORDERED.