*570 PER CURIAM:
The government charged defendant-ap-pellee Jose Luis Ortiz-Hernandez with illegally re-entering the United States in violation of 8 U.S.C. § 1326(a) and (b)(2). The government also charged Ortiz-Hernandez with violating the terms of his supervised release from a prior federal drug conviction by this illegal reentry. The two proceedings were consolidated in the district court. The district court suppressed fingerprint evidence in both the criminal case and the supervised release proceeding. United States v. Ortiz-Hernandez, 276 F.Supp.2d 1113 (D.Or.2003). The district court then denied the government’s motion to compel new fingerprint exemplars in the criminal case. United States v. Ortiz-Hernandez, 276 F.Supp.2d 1119 (D.Or.2003).
The government appeals both the suppression orders and the denial of its motion to compel fingerprint exemplars. In Ortiz-Hernandez’s criminal case, we affirm the suppression order but reverse the denial of the government’s request to compel another set of fingerprint exemplars. In Ortiz-Hernandez’s supervised release ease, we dismiss the appeal based on United States v. Vargas-Amaya, 389 F.3d 901 (9th Cir.2004).
I. Background
We rely for our factual narrative on the district court’s view of the evidence and on uncontroverted evidence in the record. See United States v. Vesikuru, 314 F.3d 1116, 1119 (9th Cir.2002) (findings of fact underlying the district court’s ruling on a motion to suppress are reviewed for clear error). Most of the narrative is based on the testimony of Portland Police Bureau Detective Sergeant Dirk Anderson, The remainder is based largely on the testimony of Sergeant John Eckhart and Officer Jeffrey Becker.
Defendant-appellee Jose Luis Ortiz-Hernandez was arrested on November 12, 2002 in Portland, Oregon, by Detective Anderson on suspicion of drug dealing. Detective Anderson and his partner were eating lunch at a McDonald’s restaurant in Portland when they saw the defendant and another man, later identified as Selmo Valenzuela, walking north on 82nd Avenue from Stark Street. Detective Anderson testified that he “believed” OrtizAHernan-dez was wearing a “purple shirt or sweatshirt of some type.” Several minutes later, Detective Anderson thought he saw the same two men drive past the McDonald’s in a red Toyota 4-Runner. He testified that he saw two Hispanic-appearing men in the Toyota, and that he “believe[d] there was purple clothing in there as well.” Detective Anderson saw the Toyota circling around the area of 82nd Avenue and Washington Street in a manner that led him to believe that the two men might be involved in drug sales.
After lunch, Detective Anderson and his partner were driving north on 82nd Avenue when they observed the Toyota parked in a Safeway grocery store parking lot. Detective Anderson saw Ortiz-Hernandez and Valenzuela walking toward the Safeway, away from the' parked Toyota. Detective Anderson did not see them get out of the Toyota. Detective Anderson saw Ortiz-Hernandez and Valenzuela speak to “another Hispanic male,” later identified as Wilfredo Alvarez-Quintana. Alvarez-Quintana then got into the Toyota. The driver and a Hispanic male passenger then drove the Toyota out of the parking lot.
Detective Anderson testified that despite a recent change eliminating the ability to “call back” on the public payphones at the Safeway, “there still are drug transactions that occur there daily.” Detective Anderson testified that Ortiz-Hernandez *571 and Valenzuela used the payphones “intermittently” at the Safeway. When a gray Jeep Cherokee arrived, Ortiz-Hernandez and Valenzuela spoke to the driver and passengers and got into the back seat. At that time, Detective Anderson still believed that Ortiz-Hernandez and Valenzuela had driven the Toyota to the Safeway and that Alvarez-Quintana and his passenger had then driven away in the same Toyota. This belief led Detective Anderson to conclude that the men in the Toyota were dealing drugs. He requested that an officer go to the Safeway to watch the Jeep Cherokee while he followed the Toyota.
When the Toyota stopped of its own accord at a nearby parking area, Detective Anderson got out to talk to the driver, who identified himself as Wilfredo Alvarez-Quintana. Alvarez-Quintana said he was the only one who had driven the Toyota. He also told Detective Anderson that he and his nephew had driven to Portland from The Dalles, a city about 80 miles east of Portland on the Columbia River, and that he was “land of lost.” Alvarez-Quin-tana told Detective Anderson that he had spoken briefly at the Safeway parking lot with someone he mistakenly thought he knew. Detective Anderson searched the Toyota with Alvarez-Quintana’s consent and found nothing illegal. He then allowed Alvarez-Quintana and his nephew to go on their way.
Meanwhile, Sergeant Eckhart was watching the Jeep Cherokee at the Safeway. He broadcast on the police radio that he was watching the Jeep from the “handicap spot,” and that the Jeep was “on the northeast corner, Safeway.” Sergeant Eckhart saw the driver and passengers, including Ortiz-Hernandez, talking with each other. He reported over the police radio that they were “making some kind of deal in there.” When the Jeep drove out of the Safeway parking lot, the driver failed to use a turn signal. Sergeant Eck-hart radioed for a marked police car to stop the Jeep. Officer Becker responded and pulled the Jeep over in front of a coffee shop. Officer Becker asked the driver for her license, proof of insurance, and registration. The driver identified herself as Marie Lewis. Her driver’s license had been suspended.
Detective Anderson heard over the radio that the Jeep had been stopped and returned to investigate. There were five people in the Jeep. Lewis and an adult man, Dennis Urban, were in the front seats. Ortiz-Hernandez, Valenzuela, and Lewis’s three or four-year-old nephew were in the back seat.[1] When Detective Anderson arrived, he had a brief conversation with Lewis in which she referred to Ortiz-Hernandez as “Juan.”
Detective Anderson testified, “After my brief conversation with [Lewis], Sergeant Eckhart had also told'me, prior to contacting the individuals, that it appeared that the defendant had swallowed, which is real common for street-level deliverers.” Detective Anderson explained that street-level dealers sometimes keep drugs in balloons in their mouths and swallow them in order to avoid being caught with the drugs. He testified, “[T]hey remove them and sell them one at a time. And if confronted, they’ll just swallow the balloons.”
After his initial conversation with Lewis, Detective Anderson asked Ortiz-Hernandez and Valenzuela to get out of the Jeep. Because it was raining, he had them move inside the coffee shop. He asked for then-names and birthdays. Ortiz-Hernandez *572 claimed his name was Ruiz Perez-Cota,[2] and said that he was born on May 6, 1968. Detective Anderson asked Ortiz-Hernandez his age, and Ortiz-Hernandez gave an age that was “a year off’ from the birth date he had given. At the suppression hearing, Detective Anderson could not remember the actual age Ortiz-Hernandez had given. He could remember only that it was “off.”
Detective Anderson then returned to the Jeep. Lewis admitted she was on methadone but sometimes “chipping” with heroin. According to Detective Anderson, this meant that she was “cheating a little and still using a little heroin.” Detective Anderson asked her if she had just purchased heroin from the defendant. Lewis denied it but admitted to the officer that she had done so in the past. She said that she had not seen him for a while and that she thought he had been “down in Mexico.” Urban, the adult front seat passenger, had needlemarks on his arms. He told Detective Anderson that he was a recovering heroin addict.
Detective Anderson went back into the coffee shop. He asked Ortiz-Hernandez if he had ever sold drugs. Ortiz-Hernandez said no. Detective Anderson then conducted a strip search of Ortiz-Hernandez in the coffee shop restroom and found no drugs or anything else that would have indicated that he was selling drugs. Detective Anderson examined the contents of Ortiz-Hernandez’s wallet and found a Safeway card bearing the name of Miguel Valdez. Detective Anderson then formally placed Ortiz-Hernandez and Valenzuela under arrest for attempted delivery of a controlled substance.
After arresting Ortiz-Hernandez and Valenzuela, Detective Anderson returned to Lewis and told her that he could impound the Jeep and search it at the station because her license was suspended. She consented to a search at the scene instead. The officers found a syringe with unspecified drug “residue” under the front seat near her purse. The officers allowed Lewis, Urban, and the boy to leave in the Jeep. They gave Lewis a warning for failing to signal while turning. Detective Anderson explained to the district court that he had allowed Lewis to go free because “[p]ri-marily we were interested in the dealers, and we thought we had the dealers.”
Ortiz-Hernandez and Valenzuela were then taken to the police station. The officers ran the names “Ruiz Perez-Cota” and “Miguel Valdez,” as well as various dates of birth, through the “local system” and the National Crime Information Center system without result. Detective Anderson then arranged for Ortiz-Hernandez to have a telephone interview with an Immigration and Naturalization Service (INS) agent. He testified that he set up the interview because he assumed that Ortiz-Hernandez “was most likely wanted.” The interview produced no incriminating information. Detective Anderson then arranged for Ortiz-Hernandez to be fingerprinted at the Multnomah County Justice Center. When his fingerprints were run through the Automated Fingerprint Identification System, he was identified as Jose Luis Ortiz-Hernandez.
Once he knew Ortiz-Hernandez’s true name, Detective Anderson was able to discover that Ortiz-Hernandez had a criminal record. Ortiz-Hernandez had a previous conviction for eluding examination and inspection by immigration officials, as well as convictions for drug possession and deliv *573 ery. After serving a term of 30 months in prison, he had been placed on a one-year term of supervised release and had been deported to Mexico on May 3, 2002.
The state drug charges for which Detective Anderson had arrested Ortiz-Hernandez were later dropped. On December 5, 2002, a federal warrant and Order to Show Cause were issued alleging that Ortiz-Hernandez violated his supervised release by illegally reentering the United States. On December 17, 2002, Ortiz-Hernandez was indicted by a federal grand jury for illegal reentry in violation of 8 U.S.C. § 1326(a) and (b)(2).
The criminal case and supervised release proceeding were consolidated in the district court. The district court published two opinions. First, in both the criminal case and the supervised release proceeding, it suppressed the evidence of the fingerprints obtained at the Multnomah County Justice Center. Ortiz-Hernandez, 276 F.Supp.2d 1113. Second, it denied the government’s motion for a fingerprint exemplar in the federal criminal case. Ortiz-Hernandez, 276 F.Supp.2d 1119. The government has timely appealed both rulings.
II. The Criminal Case
The district court decided two questions in the criminal case brought under 8 U.S.C. § 1326(a) and (b)(2). First, should the fingerprint evidence taken by state officers at the Multnomah County Justice Center be suppressed? Second, should Ortiz-Hernandez be compelled to provide a second set of fingerprint exemplars to prove his identity at his federal trial? We address these questions in turn.
A. Suppression of the Fingerprint Evidence
1. Probable Cause
The district court held that Ortiz-Hernandez was arrested and taken into custody without probable cause. Because we cannot say that the district court’s factual conclusions are clearly erroneous, we must agree with the district court’s legal ruling.
The existence of probable cause is a mixed question of law and fact. We review the legal conclusions de novo because “independent review is ... necessary if appellate courts are to maintain control of, and to clarify, the legal principles” involved. Ornelas v. United States, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (citation omitted). Findings of fact underlying the district court’s legal determinations are reviewed for clear error. See United States v. Sandoval-Venegas, 292 F.3d 1101, 1104 (9th Cir.2002). We “give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.” Ornelas, 517 U.S. at 699, 116 S.Ct. 1657. “Probable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime.” United States v. Buckner, 179 F.3d 834, 837 (9th Cir.1999) (internal quotation marks and citations omitted). Absent probable cause, a warrantless arrest is illegal. Id.
Police officers may rely on the totality of facts available to them when determining whether probable cause exists to make an arrest. For example, “[t]he experience and expertise of the officers involved in the investigation and arrest may be considered.” United States v. Hoyos, 892 F.2d 1387, 1392 (9th Cir.1989), overruled on other grounds by U.S. v. Ruiz, 257 F.3d 1030 (9th Cir.2001). Officers may also consider the nature of the area as part of the calculus of suspicion, although it is not enough on its own to *574 justify a stop or search. See Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Further, providing conflicting information in response to police questions can be grounds for suspicion. See United States v. Koshnevis, 979 F.2d 691, 695 (9th Cir.1992) (suspect’s contradicting himself and nervousness were a part of the probable cause determination). If probable cause is established at any early stage of the investigation, it may be dissipated if the investigating officer later learns additional information that decreases the likelihood that the defendant has engaged, or is engaging, in criminal activity. A person may not be arrested, or must be released from arrest, if previously established probable cause has dissipated. “As a corollary ... of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause.” Bigford v. Taylor, 834 F.2d 1213, 1218 (5th Cir.1988); BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir.1986) (citation omitted) (“The continuation of even a lawful arrest violates the Fourth Amendment when the police discover additional facts dissipating their earlier probable cause.”).
We need not decide whether probable cause existed to detain and search Ortiz-Hernandez at the coffee shop. We assume there was reasonable suspicion to justify at least an initial inquiry into whether there was street-level drug dealing in progress. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The determinative question before us is whether there was probable cause when Ortiz-Hernandez was arrested and taken into custody by the Portland officers. When Detective Anderson formally arrested Ortiz-Hernandez, he knew that the men in the red Toyota 4-Runner were not Ortiz-Hernandez and Valenzuela, whom he had seen walking north on 82nd Avenue. He also could not show that the men in the Toyota were involved in drugs. He had observed Ortiz-Hernandez and Valenzuela talking on the payphones at Safeway. Despite a recent change resulting in an inability to call back on those payphones, this was still an area known for drug sales. Detective Anderson knew that Lewis, Urban, and Lewis’s nephew had picked up Ortiz-Hernandez in a Jeep Cherokee at the Safeway parking lot after they had talked on a payphone.
After interviewing Lewis, Urban, and Ortiz-Hernandez at the coffee shop, Detective Anderson had heard Lewis’s statement that she had known Ortiz-Hernandez for some time, that she had not seen him for some time, and that she had purchased heroin from Ortiz-Hernandez in the past. He knew that Ortiz-Hernandez had denied selling drugs. He believed, because Ortiz-Hernandez stated an age that was a year “off’ from the birthdate he provided, and because of the different name on the Safeway card in his wallet, that Ortiz-Hernandez had given him a false name. After his strip search of Ortiz-Hernandez in the coffee shop restroom revealed nothing incriminating, he knew that Ortiz Hernandez had no drugs, no drug paraphernalia, and no other evidence of drug sales on his person.
In its appeal to us, the government emphasizes that Detective Anderson testified in the district court that Sergeant Eckhart had told him that he had seen Ortiz-Hernandez “swallow.” He testified, “After my brief conversation with [Lewis], Sergeant Eckhart had also told me, prior to contacting the individuals, that it appeared that the defendant had swallowed, which is real common for street-level deliverers.” The district court was skeptical of the truth of this statement and discounted it in assessing the evidence. The district court wrote:
*575 Anderson testified at the hearing that Eckhart told him “the defendant had swallowed,” and that “[Eckhart] already believed that the defendant had swallowed the narcotics” while inside the Jeep. The prosecutor did not ask Eck-hart if he had seen such a “swallowing motion.” No effort was made by authorities to determine whether the defendant had, somehow, swallowed narcotics.
276 F.Supp.2d at 1117. Detective Anderson’s testimony in the district court was, of course, hearsay. Though admissible in a suppression hearing, the district court did not have to believe the testimony. As the district court pointed out, the government could easily have asked Sergeant Eckhart, a testifying government witness, whether he had seen Ortiz-Hernandez swallow.
Moreover, Detective Anderson’s statement regarding Sergeant Eckhart’s observations may not have resonated with the district court. Sergeant Eckhart reported to Detective Anderson that it “appeared” that Ortiz-Hernandez had swallowed some drugs while the Jeep was still in the Safeway parking lot. At that time, Ortiz-Hernandez was in the back seat of the Jeep. Unbeknownst to Ortiz-Hernandez, Sergeant Eckhart was observing from the “handicap spot” and the Jeep was at the northeast corner of the parking lot. The distance between the two vehicles is unspecified; Sergeant Eckhart may well have been limited in his ability to observe Ortiz-Hernandez. Importantly, Ortiz-Hernandez also had no reason to “swallow” at that time because he did not know that he was under observation. The district court was entitled to conclude that Sergeant Eckhart’s purported statement was implausible.
Finally, as the district court pointed out, there is no evidence in the record that the police took post-arrest measures, such as obtaining a body cavity search order, to confirm that Ortiz-Hernandez had swallowed balloons containing heroin. Nor is there evidence that the jailers inspected Ortiz-Hernandez’s in-custody defecations for such balloons. Under these circumstances, we defer to the district court’s skeptical view of Detective Anderson’s testimony that Sergeant Eckhart saw Ortiz-Hernandez “swallow.”
Although the facts make this call a close one, we cannot say that the district court clearly erred when it ruled that considering the totality of evidence upon which Detective Anderson relied when he placed Ortiz-Hernandez under formal arrest, the evidence was insufficient to establish probable cause. After Ortiz-Hernandez was arrested, the officers searched Lewis’s Jeep and found the syringe containing some kind of drug “residue” under the front seat next to Lewis’s purse. They reasonably believed that the syringe belonged to Lewis, and they found nothing else related to drugs or the drug trade in the Jeep. Thus, there was nothing that the police learned after Ortiz-Hernandez’s arrest that supplied the proof that was lacking to establish probable cause when Ortiz-Hernandez had been arrested a few minutes before.
2. Use of the Initial Fingerprint Exemplars
The next issue is whether the initial fingerprint evidence obtained from Ortiz-Hernandez at the Multnomah County Justice Center after his illegal arrest must be suppressed. “We review de novo the mixed question of fact and law whether evidence deriving from an illegal search is sufficiently tainted to require suppression, because legal concepts must be applied and judgment exercised about the values that animate the Fourth Amendment.” *576 United States v. Johns, 891 F.2d 243, 244 (9th Cir.1989); see also United States v. Del Toro Gudino, 376 F.3d 997, 998 (9th Cir.2004) (reviewing de novo the question of whether fingerprint exemplars may be suppressed).
The district court concluded that Ortiz-Hernandez’s fingerprints were taken for investigatory purposes, and therefore should be suppressed under Hayes v. Florida, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), and Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). The government contends, however, that Ortiz-Hernandez’s fingerprints were taken only as a means of establishing his identity. As a result, it argues under INS v. Lopez-Mendoza, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), that the fingerprints should not be suppressed. We agree with the district court.
It is established law under Hayes and Davis that if fingerprints are taken for investigatory purposes, they must be suppressed in a criminal trial. We have followed Hayes and Davis in United States v. Garcia-Beltran, 389 F.3d 864 (9th Cir.2004), in which Garcia-Beltran was arrested in Portland, Oregon, without probable cause. Garcia-Beltran’s fingerprints were taken after his arrest and enabled Portland police to determine Garcia-Beltran’s identity. Once they knew his identity, the police were able to determine that he was an illegal immigrant. The government then charged Garcia-Beltran with illegal reentry into the United States in violation of 8 U.S.C. § 1326(a) and (b)(2). GarciaBeltran moved in his criminal case to suppress the “fingerprint exemplars.” Id. at 865. The precise circumstances under which Garcia-Beltran’s fingerprints were taken are not clear from the record, so we remanded to the district court for factfind-ing. Because, on remand, the district court found that his fingerprints were taken in part for an investigatory purpose, they could not be used as evidence against him. See id.; accord United States v. Guevara-Martinez, 262 F.3d 751, 755 (8th Cir.2001) (suppressing fingerprints taken for investigatory purposes after an illegal arrest).
We affirm the district court’s ruling suppressing the initial set of fingerprints based on an arrest without probable cause in violation of the Fourth Amendment in Ortiz-Hernandez’s criminal case (No. 03-30355). The question then is whether the government is permitted to prove the identity of Ortiz-Hernandez in a subsequent charge of illegal reentry after deportation under 8 U.S.C. § 1326 by obtaining another set of fingerprints.
B. Motion to Compel Another Set of Fingerprint Exemplars
The government moved in the district court to compel Ortiz-Hernandez to provide another set of fingerprint exemplars. The district court denied the motion on the ground that Ortiz-Hernandez’s arrest was an “egregious” race-based violation of the Fourth Amendment and suppressed all identification evidence taken following the arrest. Ortiz-Hernandez, 276 F.Supp.2d at 1122. This is an appealable order “excluding evidence” under 18 U.S.C. § 3731 and we reverse the district court’s ruling. Regardless of whether there was a race-based constitutional violation, Ortiz-Hernandez’s identity may not be suppressed.[3]
*577 Over twenty years ago, the Supreme Court established the general rule that a criminal defendant cannot suppress his identity, even when there has been some prior illegality on the part of the government. Lopez-Mendoza, 468 U.S. at 1039, 104 S.Ct. 3479. As the Supreme Court has declared: “The ‘body’ or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred.” Id. (emphasis added). We have reaffirmed that “[ijdentity evidence is inherently different from other kinds of evidence,” and refused to suppress the defendant’s identity in a 8 U.S.C. § 1326 prosecution even if it was “obtained as a result of an egregious constitutional violation.” Del Toro Gudino, 376 F.3d at 1001 (“[W]hen [the Supreme Court] said the body or identity of a defendant is ‘never’ suppressible, it meant ‘never.’ ”).
While the original set of Ortiz-Hernandez’s fingerprints should be suppressed as wrongfully obtained, the government is now aware of Ortiz-Hernandez’s identity; it may rely on his identity, as well as his criminal and immigration record, in bringing § 1326 criminal charges against him. See United States v. Guzman-Bruno, 27 F.3d 420, 422 (9th Cir.1994) (affirming the district court’s conclusion that neither the defendant’s “identity nor the records of his previous convictions and deportations could be suppressed as a result of the illegal arrest”); accord United States v. Roque-Villanueva, 175 F.3d 345, 346 (5th Cir.1999) (affirming the district court and refusing to suppress evidence of identity obtained in an illegal traffic stop, concluding that “[e]ven if the [defendant was illegally stopped, neither his identity nor his INS file are suppressible”). As we have previously articulated, “there is no sanction to be applied when an illegal arrest only leads to discovery of the man’s identity and that merely leads to the official file or other independent evidence” being brought before the court. Guzman-Bruno, 27 F.3d at 422 (internal quotation and citation omitted).
The government now may bring Ortiz-Hernandez to trial on the illegal reentry indictment and compel him to submit to another fingerprinting based on that arrest and arraignment and use the evidence for purposes of identification at trial. This result is consistent with and compelled by United States v. Parga-Rosas, 238 F.3d 1209 (9th Cir.2001). The Pargar-Rosas court concluded that, where initial fingerprint exemplars obtained as the fruit of an unconstitutional arrest were suppressed by the district court, a second set of fingerprints taken later after the defendant was indicted under 8 U.S.C. § 1326 was admissible because it was not taken for an investigative purpose. 238 F.3d at 1215 (citing Guzman-Bruno, 27 F.3d at 421). We know of no rule that prohibits rebooking on the new federal charge and processing the defendant under it, including fingerprinting and photographing during the subsequent booking. As was the case in Pargcir-Rosas, the government already knows Ortiz-Hernandez’s identity. The new set of fingerprints the government now requests, after the federal grand jury indictment for a different offense has been returned, are not sought out of “an investigative purpose” but “serve only to further establish his identity.” See Garcia-Beltran, 389 F.3d at 867 (considering Parga-Rosas, 238 F.3d at 1215).[4]
*578 Admittedly, our holding here limits the theoretical effect of suppressing the initial set of wrongfully obtained fingerprint exemplars, but this result is compelled by the nature of the evidence Ortiz-Hernandez is seeking to suppress-—-who he is. The Supreme Court has rejected applying the exclusionary rule to an individual’s identity.[5] With or without the second set of fingerprint exemplars, it is Ortiz-Hernandez’s insuppressible identity, along with his continued illegal presence in this country, that connects him to the charged crime. It is true that the government would not have known Ortiz-Hernandez’s identity without having unlawfully taken the first set of fingerprints, but that harm has no remedy under our case law beyond suppressing the initial fingerprints. See Del Toro Gudino, 376 F.3d at 1001; Guzman-Bruno, 27 F.3d at 422.
We must also consider the nature of the crime Ortiz-Hernandez is facing—the continuing violation of federal law by his ongoing illegal presence in the United States. As we concluded in Del Toro Gudino, a constable’s “blunder may allow the criminal to go free, but we have never suggested that it allows the criminal to continue in the commission of an ongoing crime.” 376 F.3d at 1002 (quoting Lopez-Mendoza, 468 U.S. at 1047, 104 S.Ct. 3479). Were Orfcizr-Hernandez to be released, law enforcement officials immediately would have probable cause to re-arrest him based on their knowledge of his identity and his criminal and immigration records. See Lopez-Mendoza, 468 U.S. at 1047, 104 S.Ct. 3479 (noting in a civil deportation context that if, after excluding evidence obtained in an unlawful arrest, the government were to release an unregistered alien, “[h]is release within our borders would immediately subject him to criminal penalties”).
*579 To conclude otherwise would lead to an absurd result. Under our Circuit’s law, “[t]he offense of being found in the United States ends when an alien is discovered and identified by the immigration authorities.” United States v. Hernandez, 189 F.3d 785, 791 (9th Cir.1999) (discussing being “found” in the United States for purposes of venue); see id. at 789 (citing cases from other circuits for a similar premise). In reaching that conclusion, we rejected the possibility that “a defendant may be found, over and over again, until the [authorities] physically arrest[ ] or de-porte] the defendant^]” and determined instead that the crime is limited to “a deported alien [remaining] in the United States until he is ‘found’ by the authorities.” Id. at 790-91 (noting that Congress did not generally criminalize “remaining in the United States”). But see Guzman-Bruno, 27 F.3d at 422-23 (declaring that a violation of 8 U.S.C. § 1326 “continues so long as the alien remains in the country”).
Ortiz-Hernandez has now been “found” by the authorities; his crime could be considered complete. Were we to conclude that, having discovered and identified Ortiz-Hernandez, the authorities are prevented from bringing him to trial, he could effectively be granted a form of judicial immunity because his continued presence after being “found” would no longer constitute a crime under 8 U.S.C. § 1326. Moreover, the statute of limitation begins to run from the date an alien is “found.” Hernandez, 189 F.3d at 791. Under the dissent’s approach, the government would have to release Ortiz-Hernandez (presumably granting him “safe conduct” en route to deportation) and then hope that it might arrest him again before the statutory time limit ran or he was deported beyond our jurisdictional reach. We reject this unreasonable result.
If the government were forced to release Ortizr-Hernandez because the first set of fingerprint exemplars is suppressed, it would immediately have the authority to rearrest and fingerprint him again in order to obtain the second set of fingerprint exemplars sought here for use in the new charge against Ortiz-Hernandez. No interest would be served, or fundamental right protected, by requiring the government to do this. Therefore, we conclude that the district court erred in denying the government’s motion to compel Ortiz-Hernandez to provide a new set of fingerprint exemplars during pre-trial proceedings on the new federal charge.
III. The Supervised Release Proceeding
Ortiz-Hernandez was originally sentenced to a one-year term of supervised release, which began on May 3, 2002. On December 5, 2002, a warrant and Order to Show Cause was issued based upon the probation officer’s statements that Ortiz-Hernandez had violated the conditions of his release. On May 3, 2003, Ortiz-Hernandez’s supervised release term was set to expire, but the district court retained jurisdiction beyond that date pursuant to 18 U.S.C. § 3583(i).
While this case was on appeal, we held in Vargas-Amaya, 389 F.3d at 907, that a “district court’s jurisdiction to revoke supervised release can be extended beyond the terms of supervision under 18 U.S.C. § 3583(i), based upon a warrant issued during the term of supervision, only if the warrant was issued ‘upon probable cause, supported by Oath or affirmation,’ as required by the Fourth Amendment.” (quoting U.S. CONST. amend. IV). In this case, the warrant supporting the extension of Ortiz-Hernandez’s period of supervised release was not based on an oath or affirmation. As a result, the district court’s jurisdiction over the revocation of *580 the supervised release ended on May 3, 2003. Accordingly, we dismiss the government’s appeal related to the supervised release proceedings, and remand to the district court for appropriate disposition.
We AFFIRM the district court’s suppression of Ortiz-Hernandez’s fingerprints in his criminal case (No. 03-30355). We REVERSE the district court’s denial of the government’s motion to compel fingerprint exemplars in his criminal case (Nos.03-30356, 03-30371). We DISMISS the appeal of Ortiz-Hernandez’s supervised release proceeding in No. 03-30371. We REMAND for further proceedings consistent with this opinion.

. Detective Anderson testified to the presence of the boy in the back seat. Officer Becker, who had made the initial stop of the Jeep, could not remember seeing him.

. The transcript reads “Ruiz[phonetic] Perez Coda.” The district court spelled the name “Ruiz Perez-Cota.” Ortiz-Hernandez, 276 F.Supp.2d at 1116. We follow the spelling used by the district court.

. The record does not support the district court's conclusion that the arrest was an "egregious” race-based Fourth Amendment violation. Nonetheless, we need not address that issue because "[w]e continue to hold today that the simple fact of who a defendant is cannot be excluded, regardless of the nature of the violation leading to his identity." *577 Garcia-Beltran, 389 F.3d at 868 (quoting Del Toro Gudino, 376 F.3d at 1001).

. The dissent would instead conclude that the fact that the initial set of fingerprints was suppressed because it was taken for investiga- *578 toiy purposes renders the government forever powerless to compel a new set of fingerprints for use in identifying Ortiz-Hernandez in the federal criminal prosecution for his new charge of being in violation of 8 U.S.C. § 1326. This ignores the clear import of our holding in Del Toro Gudino, where we unequivocally held that "a defendant’s identity obtained as a result of an egregious constitutional violation” may not be suppressed. 376 F.3d at 1001.
Similarly, reliance on Garcia-Beltran is inap-posite here. The Garcia-Beltran court considered only whether an initial set of fingerprints must be suppressed if obtained with an investigatory purpose. 389 F.3d at 867-68. There is no discussion of whether a second set of fingerprints could later be compelled to identify a defendant once he was under indictment. Only the Parga-Rosas court has addressed that issue, and we follow that approach here.
Finally, the government has no obligation in this appeal to show that it would have been able to identify Ortiz-Hernandez without the first set of fingerprints in order to bring him to trial—the government now knows his identity and that identity may never be suppressed. See Lopez-Mendoza, 468 U.S. at 1039, 104 S.Ct. 3479; Guzman-Bruno, 27 F.3d at 421-22.

. The dissent’s disagreement with this proposition is curious, given the Supreme Court’s clear language in Lopez-Mendoza. The dissent suggests that in a criminal proceeding the exclusionary rule requires the suppression of identity evidence obtained as a result of a Fourth Amendment violation. Dissent op. at 582. While the dissent is correct to note that the general rule under the Fourth Amendment is to suppress unlawfully obtained evidence, the Court created a specific exclusion from that general rule for evidence of identity. See Lopez-Mendoza, 468 U.S. at 1039, 104 S.Ct. 3479. The court held that “[t]he ’body’ or identify of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as the fruit of an unlawful arrest. ..." Id. (emphasis added). Surprisingly, the dissent ignores this unambiguous language in arguing that all unlawfully obtained evidence must be excluded in a criminal proceeding. The Supreme Court has clearly articulated the rule: When it comes to identity evidence, no distinction between criminal and civil proceedings shall be made.