BALDOCK, Circuit Judge,
dissenting:
Unable to agree on the meaning of I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), lower federal courts are divided on the question of whether, given an unlawful seizure, the “identity” of an illegal immigrant may be suppressed in the context of a § 1326 prosecution. Compare, e.g., United States v. Guzman-Bruno, 27 F.3d 420 (9th Cir.1994) (answering no); United States v. Roque-Villanueva, 175 F.3d 345 (5th Cir.1999) (same); United States v. Navarro-Diaz, 420 F.3d 581 (6th Cir.2005) (same), and United States v. Bowley, 435 F.3d 426 (3d Cir.2006) (same), with United States v. Guevara-Martinez, 262 F.3d 751 (8th Cir.2001) (answering yes), and United States v. Garcia-Beltran, 389 F.3d 864 (9th Cir.2004) (same); see also United States v. Cisneros-Cruz, 1999 WL 444926 (10th Cir.1999) (unpublished) (answering no); United States v. Alvarez-Becerra, 33 Fed.Appx. 403, 409 (10th Cir.2002) (unpublished) (Briscoe, J., concurring) (same).[1] Today, this Court prematurely and need *1122 lessly joins the debate by asking a question it need never reach, ie., “whether evidence of a defendant’s identity (including statements, fingerprints, and an A-file) may ever be suppressed as the ‘fruit’ of an unlawful arrest.” Court’s Op. at 1108. For reasons to become apparent, the simple fact is Defendant’s arrest was not unlawful.
In my view, the proper analysis of this case begins with the question of whether Agent Armendariz’ immediate identification of Defendant as an illegal immigrant constitutes evidence which the district court may' suppress on the basis of an illegal stop and detention. The answer to this question is critical because, unlike the facts in any of the foregoing cases, Agent Armendariz’ prompt recognition of Defendant as an illegal immigrant, prior to any questioning or fingerprinting, provided the agent probable cause to arrest him and take him into custody for processing. Probable cause arose from Agent Armendariz ’ knowledge of Defendant’s status and his observation of Defendant’s person. See United States v. Soto, 375 F.3d 1219, 1222 (10th Cir.2004) (probable cause demands more than mere suspicion but does not require facts sufficient for a finding of guilt). “Once the vehicles were bumper to bumper, Armendariz immediately recognized the passenger of the pickup as Gustavo Olivares-Rangel ..., an immigrant he had arrested a month or two before for being in the United States illegally.” Court’s Op. at 1106 (emphasis added). In Agent Armendariz’ own words: “The only one person, in my mind, that could not leave was the [Defendant], because I already knew he was here illegally.” Govt’s App. at 31 (emphasis added). If Agent Armendariz’ visual identification of Defendant as an illegal immigrant cannot be suppressed, neither can discovery of his alien file. This is because discovery of Defendant’s alien file resulted from a routine booking procedure, ie., fingerprinting, following his arrest based on probable cause.
By shirking the obvious, the Court makes this case unnecessarily difficult. The Court reasons that because the Government has conceded Defendant’s arrest was unlawful, it has no choice but to proceed accordingly. Court’s Op. at 1107 - 1108 & nn. 2, 3, Although the Government’s argument (both oral and written) in this case is lacking, I can find nowhere in the record, briefs, or oral argument recording where the Government concedes Defendant’s custody was unlawful once Agent Armendariz recognized Defendant as an illegal immigrant. Rather, the Government concedes only that Agent Armendariz lacked probable cause (or more properly reasonable suspicion) to stop the vehicle and detain Defendant.[2] The clearest expression of the Government’s concession is contained in its reply brief:
The government has not appealed the district court’s determination that Border Patrol’s stop of Olivares-Rangel was unlawful. The government concedes that point for purposes of this appeal. But even assuming that Olivares-Rangel’s identity was discovered as a result of an illegal stop, his identity and status as a deported alien cannot be suppressed.
Govt’s Reply Br. at 6. The Court fails to distinguish, as it did in its questioning at oral argument, between Agent Armendariz’ lack of probable cause to stop the vehicle and detain Defendant, and Agent Armendariz’ probable cause to arrest Defendant once he recognized Defendant as an illegal immigrant.
*1123 The district court made the same mistake by conflating the stop and detention with the arrest:
Agent Armendariz stopped the vehicle in which Olivares-Rangel was riding without reasonable suspicion or probable cause. The stop and arrest violated the Fourth Amendment....
Agent Armendariz’s recognition of Olivares-Rangel cannot provide a valid foundation for reasonable suspicion [or probable cause] because it was obtained by the exploitation of the illegality of the arrest....
United States v. Olivares-Rangel, 324 F.Supp.2d 1218, 1222-1223 (D.N.M.2004). That the district court erroneously viewed the agent’s recognition of Defendant as the “fruit” of an unlawful stop and detention (or an arrest as the district court and Government sometimes inartfully refer to it), rather than as an independent basis for probable cause to arrest Defendant, is painfully apparent. This Court’s failure to recognize this critical distinction leads it to erroneously conclude the Government has conceded Defendant’s arrest was unlawful.
Viewing the Government concession in the proper context, the faulty premise underlying any conclusion that Defendant was entitled to suppression of his fingerprints and alien file is simply this: Defendant’s arrest was unlawful because the pri- or stop of the vehicle in which he was a passenger was unlawful. That premise, on which the district court based its decision, has certain appeal. But for the illegal stop, Agent Armendariz might never have recognized Defendant as an illegal immigrant whom he had arrested a few weeks prior. Yet the Supreme Court has “never held that evidence is ‘fruit of the poisonous tree’ simply because it would not have come to light but for the illegal conduct of the police.” Hudson v. Michigan, — U.S. —, 126 S.Ct. 2159, 2164, 165 L.Ed.2d 56 (2006) (internal quotations omitted).[3]
*1124 Nor has the Supreme Court ever held a “[defendant’s] person should be considered evidence, and therefore a possible ‘fruit’ of police misconduct.” United States v. Crews, 445 U.S. 463, 475, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) (plurality); see also New York v. Harris, 495 U.S. 14, 18, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990). And I would not so hold today. This is because an individual has no reasonable expectation of privacy in his visual appearance when exposed to the public eye. See United States v. Santana, 427 U.S. 38, 42, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). No one, Defendant nor anyone else, had any legitimate expectation of privacy in his appearance when Agent Armendariz spotted him. See United States v. Carter, 360 F.3d 1235, 1239-40 (10th Cir.2004) (recognizing that looking through a car’s window invades no legitimate expectation of privacy). When Defendant stepped into the vehicle, he placed himself in a position for all the world to see:
The general public could peer into the interior of ... [the] automobile from any number of angles; there is no reason ... [Agent Armendariz] should be precluded from observing as an officer what would be entirely visible to him as a private citizen. There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle....
Texas v. Brown, 460 U.S. 730, 740, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality) (internal citations omitted).
The illegality of the initial stop and detention does not dictate this Court’s analysis of the suppression issue because it revealed something which cannot be suppressed, namely, Defendant’s appearance. The law did not require Agent Armendariz to “hide his eyes and count to ten” before lawfully arresting Defendant based on his unlawful presence in this country, an ongoing crime. See United States v. Jimenez-Borja, 378 F.3d 853, 857 (9th Cir.2004) (“The crime of being ‘found in’ is a continuing offense.”). If Agent Armendariz had recognized Defendant as a fugitive from justice convicted of murder, would Defendant’s arrest have been unlawful? “The constable’s blunder may allow the criminal to go free, but we have never suggested that it allows the criminal to continue in the commission of an ongoing crime.” Lopez-Mendoza, 468 U.S. at 1047, 104 S.Ct. 3479. Under these circumstances, Agent Armendariz’ failure to arrest Defendant would have “clearly frustrate^] the express public policy against an alien’s unregistered presence in this country. Even the objective of deterring Fourth Amendment violations should not require such result.” Id.[4]
*1125 Because, prior to any questioning or fingerprinting, Agent Armendariz identified Defendant’s person as that of an illegal immigrant, this case is unlike any ease on which the Court relies to support its holding. Davis v. Mississippi 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) and Hayes v. Florida, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), two cases on which the Court extensively relies, have no bearing upon our case. The issue in those cases was whether the police, in the absence of probable cause, could detain defendants for the sole purpose of taking their fingerprints as part of a criminal investigation. The Court said absolutely not, and correctly so. “Detentions for the sole purpose of obtaining fingerprints are ... subject to the constraints of the Fourth Amendment.” Davis, 394 U.S. at 727, 89 S.Ct. 1394. In other words, “in the absence of probable cause ... investigative detentions at the police station for fingerprinting purposes [can] not be squared with the Fourth Amendment.” Hayes, 470 U.S. at 815, 105 S.Ct. 1643. In stark contrast to Davis and. Hayes, Agent Armendariz did not take advantage of Defendant’s initially unlawful detention to obtain his fingerprints. Rather, Agent Armendariz arrested and fingerprinted Defendant because he had probable cause to do so based upon his visual identification of Defendant’s person and prior knowledge of Defendant’s status.[5]
Properly applying the law to the facts of this case, I cannot agree that Defendant Olivares-Rangel’s fingerprinting may have been for investigative purposes rather than simply part of a routine booking procedure. No remand for further fact-finding is necessary. Regardless of whether Defendant’s fingerprints were taken in anticipation of civil deportation or criminal prosecution, Defendant was lawfully in custody when taken to headquarters for fingerprinting because Agent Armendariz had probable cause to arrest him apart from any statements Defendant may have made.[6] The Government makes the very point — Agent Armendariz did not take Olivares-Rangel into custody to obtain his fingerprints in the hope of connecting him to a crime: “In this case, the agent immediately recognized Olivares-Rangel as a person he had previously arrested for being in the United States illegally, and his fingerprints were taken to process him as an illegal alien[.]” Govt’s Br. at 10-11. The discovery of Defendant’s A-file follows as a routine matter from Defendant’s fingerprinting pursuant to an arrest based on probable cause. That should be the end of our analysis and the end of Defendant’s motion to suppress his fingerprints and A-file.[7] I dissent.

. In her concurring opinion in Alvarez-Becerra, Judge Briscoe soundly refutes this Court's interpretation of Lopez-Mendoza’s language regarding the identify of a defendant:
Although the Court’s statement was initially made in response to the jurisdictional argument that respondent Lopez-Mendoza should not be subject to prosecution because his arrest was illegal, the Court reiterated the statement when addressing respondent Sandoval-Sanchez' evidentiary argument and the relative value of the exclusionary rule in deportation proceedings. The clear import of the Court’s statement is that the "identify” of a defendant is not itself suppressible; that is, the mere fact that a defendant was illegally brought before the court or that his or her identify was learned as a result of an illegal search or arrest does not mean that the government will not be allowed to prove the defendant’s identity.
33 Fed.Appx. at 409 (Briscoe, J., concurring) (internal citation omitted) (citing Roque-Villanueva and Guzman-Bruno with approval).

. Of course, a vehicle stop constitutes a detention of both driver and passenger. See United States v. Erwin, 875 F.2d 268, 270 (10th Cir.1989) (recognizing a passenger's standing to challenge a vehicle stop as a form of detention).

. Although my dissent does not turn on the cost/benefit analysis underlying the exclusionary rule's application, I find interesting that the Court makes scant mention of Lopez-Mendoza’s lengthy discussion as to why suppression of an illegal immigrant’s identity has little deterrent effect on illegal detentions. 468 U.S. at 1042-46, 104 S.Ct. 3479. The Supreme Court observed that “only a very small percentage of arrests of aliens are intended or expected to lead to criminal prosecutions.” Id. at 1043, 104 S.Ct. 3479. Rather, a border patrol agent's primary objective is to obtain the deportation of illegal immigrants. Indeed, Agent Armendariz testified that the other three men in the vehicle with Defendant were simply returned to Mexico. Govt's App. at 47. Little deterrent value attaches to squelching illegal detentions because the "person and identity” of an illegal immigrant are not suppressible in civil deportation proceedings. 468 U.S. at 1043, 104 S.Ct. 3479. Moreover, 97.5% of arrested illegal immigrants agree to voluntary deportation:
Every [border patrol] agent knows, therefore, that it is highly unlikely that any particular arrestee will end up challenging the lawfulness of his arrest.... When an occasional challenge is brought, the consequences from the point of view of the officer's overall arrest and deportation record will be trivial. In these circumstances, the arresting officer is most unlikely to shape his conduct in anticipation of the exclusion of evidence....
Id. at 1044, 104 S.Ct. 3479. Finally, because a defendant may be reindicted for violating § 1326 notwithstanding an illegal detention, suppressing his identity would have little practical deterrent effect on border patrol agents. See United States v. Ortiz-Hernandez, 427 F.3d 567, 576-79 (9th Cir.2005); Navarro-Diaz, 420 F.3d at 588. The cost of suppression on the other hand is far from slight, see Court’s Op. at 1115 n. 9, because, among other reasons, the inquiry into an agent's subjective motivations places yet another burden on border courts already swamped with immigration cases. Accordingly, Lopez-Mendoza may mandate that Defendant's motion to suppress his fingerprints and alien file be denied notwithstanding any Fourth Amendment violation. See Hudson, 126 S.Ct. at *1124 2163 (noting the exclusionary rule is "applicable only where its remedial objectives are thought most efficaciously served, that is, where its deterrence benefits outweigh its substantial social costs”) (internal quotations and citations omitted).

. Any suggestion that an ultimate resolution in favor of Defendant in this case will exempt him from criminal prosecution under § 1326 is mistaken. The Government is now aware of Defendant’s identity and, after thirty months, that knowledge is surely sufficiently attenuated from Agent Armendariz’ initial encounter with Defendant on February 2, 2004. Because the violation of § 1326 is an ongoing crime, the Government may make use- of its knowledge to recharge Defendant with illegal entry and require him to submit to fingerprinting. See Garcia-Beltran, 443 F.3d at 1127-35. Perhaps the Sixth Circuit said it best inNavarro-Diaz, 420 F.3d at 587:
If [defendant’s] identity may be suppressed, the moment the court lets him go, he is immediately committing the continuing violation of being present in the United States after having been deported.... Directing the district court to grant [defendant's] suppression motion, therefore, would not affect the ultimate outcome of the charge against him. If the government were forced to drop its prosecution of [defendant], the police could simply approach *1125 him on his way out of the courtroom door and demand that he identify himself,
(internal quotations omitted); see also OrtizHemandez, 427 F.3d at 577 (“While the original set of [defendant's] fingerprints should be suppressed as wrongfully obtained, the government is now aware of [defendant's] identity; it may rely on his identity, as well as his criminal and immigration record, in bringing § 1326 criminal charges against him.").

.Agent Armendariz' identification of Defendant further distinguishes our situation from Guevara-Martinez, 262 F.3d at 751, an Eighth Circuit case extensively relied on by this Court. In that case, officers unlawfully detained defendant while they investigated his immigration status. That investigation included fingerprinting defendant to reveal his true identity as an illegal immigrant.

. Of course, I do not agree that Defendant’s subsequent statements may be suppressed under the Fohrth Amendment as the “fruit" of an unlawful arrest. Those pre-Miranda statements, however, might be suppressed under the Fifth Amendment's proscription against self incrimination. See United States v. Parra, 2 F.3d 1058, 1067-68 (10th Cir.1993).

. In view of the foregoing analysis, I need not discuss whether Defendant's A-file might be suppressed as the “fruit” of an unlawful ar *1126 rest. See Guzman-Bntno, 27 F.3d at 421-22 (Wallace, J.) (”[T]here is no sanction to be applied when an illegal arrest only leads to discovery of the man’s identity and that merely leads to the official file or other independent evidence.”) (internal quotations omitted).